William John NICHOLAS, M.D., F.A.C.C.,
Complainant–Appellee,

and

The Committee on Anticompetitive
Conduct, State of Colorado,
Appellee,

v.

NORTH COLORADO MEDICAL CEN-
TER, INC., a Colorado not-for-profit
corporation, and The Governing Board
of Directors of the North Colorado Med-
ical Center, Respondents–Appellants.

No. 93CA1379.

Colorado Court of Appeals,
Div. IV.

Feb. 2, 1995.

Rehearing Denied March 16, 1995.

Certiorari Granted Sept. 25, 1995.

Nicholas Law Office, Lillian N. Sharpe, Philip Nicholas, Laramie, WY, for complainant-appellee.

No appearance for appellee.

Yu, Stromberg, Huotari & Cleveland, Frederick Y. Yu, Barbara L. Crawford, Denver, CO, for respondents-appellants.

Opinion by Judge CASEBOLT.

In this appeal from the findings and conclusions of a committee of the Colorado State Board of Medical Examiners known as the committee on anticompetitive conduct, North Colorado Medical Center, Inc., (NCMC) and its governing board of directors seek review of the determination that NCMC's action in restricting the staff privileges of William John Nicholas, M.D., was the result of unreasonable anticompetitive conduct. We affirm.

Nicholas joined the partnership of the Greeley Medical Clinic, an entity unrelated to NCMC, as an invasive cardiologist in the summer of 1989. At that time, the clinic employed three other invasive cardiologists who provided most, if not all, of the invasive cardiology services in Greeley. Also in the summer of 1989, Nicholas joined the staff of Greeley's hospital, NCMC, and was granted provisional invasive cardiology privileges. NCMC was the only facility in Greeley equipped and staffed to handle invasive cardiology cases.

Nicholas' contract with the Greeley Medical Clinic was terminated by the other three cardiologists in September of 1990. This action had no official effect on his independent status as a member of the staff of NCMC; however, the cardiologists at the clinic who terminated Nicholas' contract also worked at the hospital.

According to NCMC, a large number of variance reports were filed against Nicholas,

which prompted the hospital's Medical Quality Assessment Committee to begin an investigation of Nicholas in early 1990.

The Medical Quality Assessment Committee is a standing committee of the hospital which reports to the Credentials Subcommittee, a subcommittee of an entity called the House Committee. The House Committee was charged by the hospital's Board of Directors (governing board) with the responsibility of running the daily operations of the hospital.

After conducting an investigation, the Medical Quality Assessment Committee recommended to the Credentials Subcommittee that Nicholas be evaluated by an outside proctor. A physician from outside the Greeley area was employed for this purpose. This outside proctor's investigation report was critical of Nicholas, and in November of 1991, the Credentials Subcommittee released a Corrective Action Report, recommending that Nicholas progress to active medical staff membership on a probationary basis without invasive cardiology privileges.

In accordance with NCMC bylaws, Nicholas requested appointment of a Fair Hearing Panel in order to review the recommendation of the Credentials Subcommittee. The Fair Hearing Panel issued its findings and recommendations in March 1992, rejecting many of the quality of care findings of the Credentials Subcommittee and recommending reinstatement of Nicholas' invasive cardiology privileges on a probationary basis.

Both Nicholas and the Credentials Subcommittee appealed the Fair Hearing Panel's recommendations to the House Committee. The House Committee rejected the recommendation of the Fair Hearing Panel and recommended that Nicholas progress to active status without invasive cardiology privileges for a probationary period of 12 months, after which time he could apply for invasive cardiology privileges. This recommendation was adopted by the governing board.

Acting pursuant to § 12–36.5–106, C.R.S. (1991 Repl.Vol. 5B), in June of 1992, Nicholas filed a complaint with the Colorado State Board of Medical Examiners committee on anticompetitive conduct (committee). In his complaint he alleged that his loss of privileges resulted from the efforts of another invasive cardiologist previously employed with him at the Greeley Medical Clinic (opposing cardiologist) to eliminate him as a competitor. After extensive discovery and a hearing, the committee issued its Final Committee Report on July 12, 1993. The committee made findings and issued conclusions that found the existence of unreasonable anticompetitive conduct and, thus, set aside the action of the governing board.

The committee found that the opposing cardiologist was hostile to Nicholas and that he openly exhibited his low opinion of Nicholas. This, in turn, caused others to view Nicholas in a negative light, scrutinize his work, and not refer him patients.

In addition, the committee found that there was evidence of a plan to bias the independent review of Nicholas. First, the reviewer had been provided with a written summary of Nicholas' professional competence which was, in the opinion of the committee, unfairly slanted and biased against Nicholas. Moreover, the independent reviewer was asked to meet with the opposing cardiologist, but not with a doctor who had acted as Nicholas' in-house proctor who was known to hold a generally favorable opinion of Nicholas. Finally, the committee found that misinformation about whether Nicholas had improperly altered an EKG report was allowed to linger uncorrected by members of the peer review team until after the Credentials Subcommittee had published its Corrective Action Report.

The committee also found disturbing the fact that the Credentials Subcommittee recommended termination of Nicholas' invasive cardiology privileges, even though the Quality Assurance Committee and Fair Hearing Panel had recommended less severe action. It determined that this, in conjunction with the governing board's rejection of the Fair Hearing Panel's recommendations, was evidence of a concerted action to remove Nicholas from the Greeley medical scene.

Although it concluded that no single circumstance was sufficient, standing alone, to prove concerted action, the committee found that the totality of circumstances was suffi-

cient to prove that the opposing cardiologist had a plan to eliminate Nicholas from cardiology practice in the Greeley area and that one or more persons involved in the peer review process knew of and joined his plan.

Further, the committee concluded that NCMC was the principal, if not the only, place in the Greeley area where an invasive cardiologist could practice. Therefore, when the hospital denied invasive cardiology privileges to Nicholas, his ability to compete in the Greeley market was destroyed. This in turn, said the committee, had an adverse effect on competition.

It then determined that the peer review process was not conducted in good faith as a quality assurance measure. Rather, it concluded that personal hostility towards Nicholas was a motivating factor for those acting in concert against him.

The committee noted that the opposing cardiologist had only limited direct observation of Nicholas' work, making it unlikely he was motivated by genuine concern for quality assurance. The opposing cardiologist's strong dislike of Nicholas was well known by the employees of the hospital. Moreover, the committee found there was evidence which indicated that the hospital intended to "make a case" against Nicholas rather than achieve objective quality assurance. Additionally, it again noted that the less severe sanctions were rejected by the governing board.

Finally, the committee determined that, but for the concerted action of individuals improperly motivated against Nicholas, the final action of the governing board terminating his invasive cardiology privileges would not have resulted. It found that the initiator or initiators of the process were doctors who harbored a personal dislike for Nicholas and their behavior towards him resulted in ill-feeling among the employees of the hospital. This resulted in Nicholas receiving greater scrutiny of his work. The committee concluded that the severe ultimate action of the governing board was the result of a slanted perspective, and the corrective action would have otherwise been far less severe.

Therefore, although the committee was not convinced that anyone intended to eliminate Nicholas in order to obtain competitive advantage, it found that a personal agenda motivated by animosity was insufficient to outweigh the adverse effect upon competition. Consequently, it set aside the action of NCMC's governing board. NCMC now seeks review of that determination.

## I.

▆ As an initial matter, Nicholas contends that NCMC does not have standing to challenge and seek review of the decision of the committee because NCMC, acting in its peer review capacity, is a subordinate agency of the committee. We disagree.

In *Martin v. District Court,* 191 Colo. 107, 550 P.2d 864 (1976), the supreme court held that an agency lacks standing to seek administrative review of a superior state agency when two conditions are met: (1) the agency seeking judicial review is subordinate to the agency whose decision is sought to be reviewed, and (2) no statutory provision confers a right upon the subordinate agency to seek judicial review of the superior agency's decision. *See also Maurer v. Young Life,* 779 P.2d 1317 (Colo.1989).

▆ Here, when performing peer review activities, the governing board of NCMC is clothed with the status of a state agency. *See* § 12–36.5–103, C.R.S. (1991 Repl.Vol. 5B). There is no provision in the statute that indicates whether the governing board acts in a subordinate capacity to the committee for purposes of peer review.

However, even if we assume, without deciding, that the NCMC governing board, while acting as a peer review entity, is a subordinate state agency to the committee on anticompetitive conduct, we conclude that *Martin* does not preclude a finding of standing because § 12–36.5–106(10)(a), C.R.S. (1991 Repl.Vol. 5B) expressly confers a right to seek judicial review of the committee's decision.

That statute states:

Following final administrative action by the [anticompetitive conduct] committee, such action of the committee may be reviewed only by the court of appeals

through appropriate proceedings brought pursuant to section 24-4-106(11), C.R.S. There is no reason to conclude that the judicial review authorized by this section is not available to governing boards.

■ Because we conclude that, by virtue of § 12-36.5-106(10)(a), NCMC and its governing board are not *precluded* from appellate review under *Martin,* we must next consider whether NCMC has met the general standing requirements established by *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977). *See Maurer v. Young Life, supra.*

To resolve the issue of standing under *Wimberly,* we must determine whether: (1) the hospital has sustained an injury in fact, and (2) whether the injury was to a legally protected right.

In *Maurer v. Young Life, supra,* the supreme court held that interference by a reviewing agency with the authority of another agency to carry out its enforcement and policymaking functions is sufficient to demonstrate an injury in fact. Accordingly, NCMC has established a sufficient injury in fact.

As to the second factor, NCMC clearly has a legally protected interest in ensuring quality care for its patients. Moreover, NCMC may establish that its injury was to a legally protected interest by demonstrating that the General Assembly has expressly conferred on the hospital the right to seek judicial review of the committee's decision. *Maurer v. Young Life, supra.* Since we have already concluded that § 12-36.5-106(10)(a) evinces a legislative grant to NCMC of the right to seek appellate review of the committee's final order, NCMC has demonstrated that the "injury" was to a legally protected interest.

## II.

NCMC first contends that its governing board was entitled to a specific presumption that its professional review activities were undertaken for the purpose of assuring quality care and patient safety. Consequently, it asserts, the committee on anticompetitive conduct erred by failing explicitly to recognize and give effect to such a presumption. Alternatively, it asserts that the decision of the governing board of NCMC is entitled to a presumption of regularity in proceedings before the committee on anticompetitive conduct and that this presumption was likewise erroneously ignored by the committee.

We disagree that the specific presumption exists under these circumstances, but conclude that the decision of the board is entitled to a presumption of validity and regularity. However, we further conclude that the committee recognized and gave appropriate weight to the presumption of validity and regularity.

### A.

We look to the express terms of the statute involved to determine if a specific presumption exists that NCMC's professional review activities were undertaken for the purpose of assuring quality care and patient safety. The pertinent statutes, contained at § 12-36.5-101, et seq., C.R.S. (1991 Repl.Vol. 5B) do not provide for such a specific presumption. Nothing in the legislative declaration, or in the substantive provisions of the statutes, so mandates.

■ NCMC contends, however, that the federal counterpart of this legislation, the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101, et seq. (1986), contains this specific presumption. It asserts, therefore, that because the Colorado legislation was enacted to "opt in" to the federal act, that legislation should be understood to incorporate such a presumption.

■ In the federal act, a professional review action is presumed to have been taken in the reasonable belief that the action was in the furtherance of quality health care if a reasonable effort is made to obtain the facts of the matter, if reasonable notice and hearing procedures are afforded to the physician, and if there is a reasonable belief that the action was warranted by the facts. 42 U.S.C. § 11112 (1986).

The asserted presumption in the federal act arises in a context much different than the statutory scheme before us. The federal standards which are presumed to be met by an entity conducting professional review ac-

tivities are used in determining whether *liability limitations* for the entity are triggered, issues not involved here. Moreover, there is nothing in the federal act to indicate that a court should employ such a presumption upon general appellate review of agency action.

Nor does the Colorado legislation incorporate by reference any presumptions of the federal act. Rather, § 12–36.5–201 and 12–36.5–202, C.R.S. (1991 Repl.Vol. 5B) merely indicate that the Colorado legislation is intended to be "responsive" to the federal act. Those sections of the statute direct that rules and regulations adopted shall be "consistent with the standards and the reporting requirements of [the federal] ... act." We find no reason to equate the absence of such a specific presumption in the Colorado statute to inconsistency in the rules and regulations adopted by the committee.

Hence, we conclude that no express presumption as contended by NCMC exists in the statute.

### B.

■ We do, however, agree that the governing board's decision should be accorded a presumption of validity and regularity before the committee on anticompetitive conduct.

■ An administrative agency decision is presumptively valid. *People v. Gallegos,* 692 P.2d 1074 (Colo.1984); *Life Investors Insurance Co. v. Smith,* 833 P.2d 864 (Colo.App. 1992). Here, the governing board was clothed with state agency authority by virtue of § 12–36.5–103, C.R.S. (1991 Repl.Vol. 5B), which in essence makes professional review committees and governing boards arms of the State Board of Medical Examiners.

■ We do not agree, however, that the medical examiners committee failed to recognize and give appropriate weight to this presumption. The final committee order recognizes this presumption of validity and regularity in several ways.

First, the committee recognized that its role under the enabling statute was limited to reviewing the final action of a governing board only to see if the action resulted from unreasonable anticompetitive conduct. It specifically recognized that it could not set aside or modify the action on "fairness" grounds, or second guess its correctness, regardless of any perceived errors or injustices in the peer review process. *See* § 12–36.5–106, C.R.S. (1991 Repl.Vol. 5B).

Second, the committee recognized that one of the purposes of the committee's enabling statute is to foster bona fide peer review and further noted that peer review actions which are conducted in good faith will generally not be deemed unreasonable anticompetitive conduct even though they result in the elimination of a competitor.

Third, the committee acknowledged that Nicholas would bear the burden of proving, by a preponderance of the evidence, that the final action of the governing board resulted from unreasonable anticompetitive conduct. By allocating to Nicholas the burden of proof, the committee implicitly recognized the presumption of regularity and validity.

We conclude that these findings in the final committee order are sufficient to constitute a recognition of the presumption of regularity and validity to be accorded to agency action. *See Hudspeth v. Board of County Commissioners,* 667 P.2d 775 (Colo.App. 1983) (lay agency's findings may be both explicit and implicit). Further, it appears the committee granted the presumption appropriate deference under the circumstances.

### III.

NCMC next contends that the findings and conclusions of the anticompetitive committee are contrary to federal antitrust principles, utilize an incorrect causation standard, and are not supported by substantial evidence in the record. More specifically as to the latter contention, NCMC contends that the record does not support: (1) a finding of conspiracy; (2) antitrust injury to competition in the relevant market; (3) a causal connection between the alleged conspiracy and the final action of the governing board; or (4) a finding of unreasonableness under a "rule of reason" analysis. We disagree with all of these contentions.

## A.

■ As to the first assertion, NCMC apparently contends that when the committee determined it would define "unreasonable anticompetitive conduct" by reference to principles of antitrust law as applied to the health care field, it was bound to adopt, wholesale, the federal law of antitrust. Consequently, NCMC contends, proof of all four elements the committee articulated as the standard must be measured by federal caselaw in that particular field. To that end, NCMC has presented an exhaustive analysis of federal antitrust cases in the health care field and urges us to examine the evidence with reference to those requirements. We decline to do so.

We find no authority, and NCMC cites none, to indicate that either the committee or this court is bound to apply federal antitrust law in construing this particular statutory scheme. *See Brannan Sand & Gravel Co. v. Industrial Claim Appeals Office,* 762 P.2d 771 (Colo.App.1988), *aff'd sub nom. Federico v. Brannan Sand & Gravel Co.,* 788 P.2d 1268 (Colo.1990) (court not bound to follow federal law in construing state statutory scheme). Moreover, we discern no compelling policy reason to require exact compliance with each and every nuance of federal antitrust law in determining the existence of unreasonable anticompetitive conduct. *See Insul–Lite Window & Door Manufacturing, Inc. v. Industrial Commission,* 723 P.2d 151 (Colo.App.1986) (court not bound to follow federal case law interpreting definition when state statute is different). Indeed, certain features of the statutory scheme appear to us to dictate otherwise.

First, we find no distinctive direction in the statute requiring the incorporation of the entirety of federal antitrust law in determining the existence of unreasonable anticompetitive conduct. While one of the committee members is directed to be an attorney with experience in the antitrust field, that command by itself falls far short of ensconcing the full panoply of federal antitrust law firmly within the ambit of this particular statute.

Second, we note that the committee is charged with making its determination based upon an eight-hour hearing. Section 12–36.5–106(9)(h), C.R.S. (1991 Repl.Vol. 5B). Practically speaking, it would be well nigh impossible for a complainant or respondent before the committee to present a complete antitrust case, satisfying all applicable proof requirements, within such a short time span, even given that some of the evidence to be considered by the committee takes the form of a transcript and other written record material before the governing board and its subagencies.

Third, the committee itself nowhere indicated that it would adopt each and every nuance in federal antitrust law for proof of unreasonable anticompetitive conduct. Rather, it was careful to state that this broad term should be defined "by reference to principles of antitrust law, as applied to the health care field." We cannot infer from this reference to antitrust "principles" a requirement that the committee's findings and conclusions should be measured by federal antitrust laws that are intended to serve far different functions, and further entirely different policies, including matters relating to damages for anticompetitive conduct which are not involved in this administrative appeal nor addressed in this statute.

Additionally, requiring a physician to marshal the resources, evidence, and information necessary to mount a federal antitrust case before the committee would, as a practical matter, significantly chill the availability and utility of the remedy statutorily granted.

Hence, we decline to require the committee to predicate its findings and conclusions upon the stringent standards of federal antitrust law. Consequently, we need not analyze each and every finding and element under those standards.

## B.

■ NCMC next contends that the committee's definition of "unreasonable anticompetitive conduct" utilized an incorrect causation standard and, consequently, the committee's finding of unreasonable anticompetitive conduct is flawed. We disagree.

■ A reviewing court is required to set aside the final orders of an administrative

agency if the agency applies an erroneous legal standard. *Electric Power Research Institute, Inc. v. City & County of Denver,* 737 P.2d 822 (Colo.1987). Determination of the applicable legal standard here requires a review of the statute.

■ In interpreting any statute, the intent of the lawmaking body must be ascertained and given effect if possible. *Ingram v. Cooper,* 698 P.2d 1314 (Colo.1985).

■ There is a presumption that the General Assembly intends a just and reasonable result when it enacts a statute, and a statutory construction that defeats the legislative intent or leads to an absurd result will not be followed. Section 2–4–201(1)(c), C.R.S. (1980 Repl.Vol. 1B); *Frohlick Crane Service, Inc. v. Mack,* 182 Colo. 34, 510 P.2d 891 (1973).

■ Questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for courts to resolve. *Dunlap v. Colorado Springs Cablevision, Inc.,* 855 P.2d 6 (Colo.App.1992). However, when the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. The agency determination is to be accepted if it is warranted in the record and has a reasonable basis in law. *Ricci v. Davis,* 627 P.2d 1111 (Colo.1981).

■ Accordingly, the interpretation of the statute by the agency charged with enforcement of that statute is generally entitled to great deference. *City & County of Denver v. Board of Assessment Appeals,* 802 P.2d 1109 (Colo.App.1990).

Here, the committee recognized that the term "unreasonable anticompetitive conduct" is not defined in the statute. It went on to state, however, that in view of the legislative declaration in § 12–36.5–101, C.R.S. (1991 Repl.Vol. 5B) and the statute's legislative history, that term should be defined by reference to principles of antitrust law as applied to the health care field.

It then determined that Nicholas had to establish four specific elements before a find-ing of unreasonable anticompetitive conduct could be made: (1) that there existed a contract, combination, or conspiracy; (2) that an adverse effect upon competition resulted, or had been intended from the concerted action, which required analysis of the relevant market; (3) that the anticompetitive conduct had been unreasonable under the "rule of reason" test, balancing the procompetitive or socially legitimate purpose of the conduct against its anticompetitive effects; and (4) that the final action had resulted from the unreasonable anticompetitive conduct under a proximate cause analysis.

NCMC challenges only the propriety of the fourth element listed above, contending in essence that the proximate cause analysis employed by the committee has no place in antitrust jurisprudence. Rather, it asserts, there must be some greater, direct link or nexus between any conspiracy and the conduct being challenged. We disagree.

Because we have concluded that strict adherence to federal antitrust principles is not required in determining the existence of unreasonable anticompetitive conduct under this statute, we need not analyze causation requirements under federal antitrust law. Rather, simple statutory analysis is all that is required.

■ Our construction of the statutory language should be the one that best effectuates the purposes of the legislative scheme. *Smith v. Myron Stratton Home,* 676 P.2d 1196 (Colo.1984). To that end, we give the statutory terms their plain and ordinary meaning. *Dunlap v. Colorado Springs Cablevision, supra.*

Under the statute, the action of the governing board must have "resulted from" the unreasonable anticompetitive conduct. Section 12–36.5–106, C.R.S. (1991 Repl.Vol. 5B). The only difficulty arises in determining whether the language "resulted from" requires simply a proximate cause analysis in which the conduct need only be *a* cause of the action, or rather whether some greater "link" is required.

"Result" in its verb form means "to proceed, spring, or arise as a consequence." *Webster's Third New International Dictio-*

*nary* 1937 (1986). Moreover, there is no modifying adverb such as "solely" or some similar language in the statute.

Colorado has never required an alleged cause to be the *sole* cause of the harm suffered. *See Kaiser Foundation Health Plan v. Sharp,* 741 P.2d 714 (Colo.1987); *Stevens v. Moore & Co. Realtor,* 874 P.2d 495 (Colo. App.1994). Rather, our jurisprudence has recognized that a number of acts may combine to cause an asserted injury.

We therefore conclude that proximate cause analysis, ubiquitous in Colorado law, is an appropriate standard to use in defining the "resulted from" language contained in the statute. Hence, we conclude that the committee's use of a proximate cause standard has a reasonable basis in law and is warranted by the record. *See City & County of Denver v. Board of Assessment Appeals, supra.*

### C.

■ We next turn to, and reject, the contention that the findings and conclusions are not supported by substantial evidence when the record is considered as a whole.

Our authority to review the committee's action is contained in § 12–35.5–106(10)(a), C.R.S. (1991 Repl.Vol. 5B). That statute directs review under the Colorado Administrative Procedure Act, § 24–4–106(11), C.R.S. (1988 Repl.Vol. 10A). Section 24–2–106(11)(e), C.R.S. (1988 Repl.Vol. 10A) contains the pertinent standard of review which requires us to determine whether the findings and conclusions of the committee are "unsupported by substantial evidence when the record is considered as a whole."

■ "Substantial evidence" means more than some evidence in some particulars. *Lassner v. Civil Service Commission,* 177 Colo. 257, 493 P.2d 1087 (1972). It is probative evidence that would warrant a reasonable belief in the existence of facts supporting a particular finding. *Delta Drywall v. Industrial Claim Appeals Panel,* 868 P.2d 1155 (Colo.App.1993). As the supreme court stated in *Colorado Municipal League v. Mountain States Telephone & Telegraph Co.,* 759 P.2d 40, 44 (Colo.1988):

Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ... and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

■ Under this standard, in determining whether the findings and conclusions are supported by substantial evidence, it is not the province of this court to measure the weight of the evidence or to resolve the credibility of witnesses. *People v. Robnett,* 859 P.2d 872 (Colo.1993).

■ Whether there is substantial evidence to support an agency's decision is a question of law, and in resolving that question of law, a reviewing court must view the record in the light most favorable to the agency decision. *Colorado State Board of Nursing v. Lang,* 842 P.2d 1383 (Colo.App. 1992). Hence, even if our decision on the merits would be different, any such conclusion may not supplant an agency decision that is supported by substantial evidence. *See* K. Davis & R. Pierce, Jr., *Administrative Law Treatise* § 11.1 (3d. ed. 1993).

Turning then to the merits, we find that the committee made extensive findings of fact and rendered conclusions concerning each of the four factors it identified as components of unreasonable anticompetitive conduct.

Concerning the existence of a contract, combination, or conspiracy, it concluded:

Concerted action is rarely proven by frank admission of the conspirators. More commonly, if concerted action exists, proof must be found in circumstantial evidence which reasonably supports the conclusion that people were acting together. Such is the case here. The committee finds from the circumstances, together with the reasonable inferences to be drawn therefrom, that there was concerted action between [the opposing cardiologist] and one or

more employees or agents of the Medical Center.

. . . .

No single circumstance is sufficient, standing alone, to prove concerted action. However, the committee is convinced by the totality of the circumstances, and by its assessment of the credibility of the witnesses, that [the opposing cardiologist] did have a plan to eliminate the Complainant from the practice of invasive cardiology in the Greeley area, and that one or more persons involved in the peer review process within the hospital knew of his desires and joined in his plan. Although the committee was presented with no evidence that [the opposing cardiologist] directly participated in the Medical Center's action against Complainant, the committee is convinced that, by his behavior, he significantly influenced the opinions of others who were responsible for the initiation and course of the peer review process.

The committee went on to list a number of factual findings which, in its view, supported that conclusion. After careful review of the record, we conclude that, when viewed in the light most favorable to the agency decision, both these findings and conclusions are supported by substantial evidence in the record. Considered in this light, moreover, the findings supply the requisite elements of a conspiracy or combination. *See Jet Courier Service Inc. v. Mulei,* 771 P.2d 486 (Colo.1989); *Schneider v. Midtown Motor Co.,* 854 P.2d 1322 (Colo.App.1992).

Concerning the existence of an adverse effect upon competition, the committee concluded that Greeley and its surrounding area were the relevant market and that the principal, if not only, place where an invasive cardiologist could practice that profession was within the Medical Center and its catheterization lab. Consequently, it determined that when NCMC denied Nicholas' invasive cardiology privileges, it destroyed his ability to compete in the marketplace. It further found that Nicholas was one of only a few physicians practicing invasive cardiology in the Greeley area, and thus, his elimination from that small and localized geographical market did have an adverse effect upon competition.

Again, based upon our review of the record, we cannot say that these findings and conclusions are unsupported by substantial evidence.

Concerning the "unreasonableness" requirement, the committee determined, in part:

One of the purposes of the committee's enabling statute is to foster bona fide peer review. Therefore peer review actions which are conducted in good faith will generally not be deemed unreasonable anticompetitive conduct even though they may result in the elimination of a competitor. Sadly, the committee is compelled to conclude that the dominant purpose of the concerted action identified above was not quality assurance. Rather, the committee finds that [the opposing cardiologist] was principally motivated by personal hostility toward Complainant, and that this motive was shared by those acting in concert with him. Although the committee is not convinced that [the opposing cardiologist], or anyone else, specifically intended to eliminate Complainant to gain a competitive advantage, a 'dollars and cents' motive is not essential to a finding of unreasonable anticompetitive conduct. A personal agenda, whether motivated by money or animosity, is simply inadequate to outweigh the adverse effect upon competition.

The committee then explicitly recognized that it had to balance the procompetitive or socially legitimate purpose of the conduct against its anticompetitive effects. Further, it acknowledged that peer review which is undertaken for the purpose of quality assurance, and thus protection of patient health, safety, and welfare is legitimate conduct and will normally outweigh the anticompetitive effects which may result. Hence, it determined, it could not find that concerted action was "unreasonable" if the dominant purpose of the concerted action is quality assurance. It then summarized the circumstances that led it to conclude that the concerted action was not motivated by a good faith interest in quality assurance.

Once more, reviewing the record in the light most favorable to the agency decision, we conclude that substantial evidence exists to support these findings and conclusions when the record is considered as a whole.

Finally, regarding causation, the committee stated:

The committee finds that but for the concerted effort of [the opposing cardiologist] and others, the final action of the governing board would not have resulted. By his behavior, he sowed seeds of ill-feeling about Complainant amongst the cath lab staff and others associated with the Medical Center. Because [the opposing cardiologist] was known to be a force to be reckoned with in the hospital, other people heeded his opinion. By his behavior, he encouraged much greater scrutiny of Complainant than otherwise would have been the case. As a consequence, a multitude of variance reports were filed against Complainant which, in the words of the Fair Hearing Panel report, were 'minor if not trivial.' Although some bona fide concerns about Complainant's practice were identified, as noted by the Fair Hearing Panel, the severe ultimate action taken by the Board of Directors was the result of a slanted perspective of Complainant borne of the concerted action of [the opposing cardiologist] and those who shared his perspective. Had the peer review process not been so infected, the ultimate corrective action would have been far less severe, and in all likelihood would not have destroyed Complainant's ability to compete in the field of invasive cardiology.

Again, the findings and conclusions are grounded in substantial evidence in the record as well; hence, we will not disturb them on appeal. Additionally, as we note in the discussion above, an appropriate causation standard was utilized by the committee.

Accordingly, NCMC's challenge predicated upon the lack of substantial evidence in the record to support the agency findings and conclusions cannot be sustained.

IV.

Having upheld the committee's findings and conclusions regarding the existence of unreasonable anticompetitive conduct, we necessarily reject NCMC's related contention that § 12–36.5–104(14), C.R.S. (1991 Repl. Vol. 5B) provides immunity from such a finding. That statute simply declares that a professional review committee or governing board which conducts its peer review activities "pursuant to the provisions of this part 1" is declared not to be an unlawful conspiracy in violation of § 6–4–102, C.R.S. (1992 Repl.Vol. 2).

Section 12–36.5–104(14), C.R.S. (1991 Repl. Vol. 5B) is not applicable under these circumstances because we deal here only with review of the administrative determination of unreasonable anticompetitive conduct, not with liability or damages issues governed by our state law of antitrust under § 6–4–102, C.R.S. (1992 Repl.Vol. 2).

We have considered NCMC's remaining contentions and conclude they lack sufficient merit to warrant reversal.

The committee order setting aside the action of the governing board of NCMC is affirmed.

MARQUEZ and ROTHENBERG, JJ., concur.