**William John NICHOLAS, M.D.,**
**Plaintiff–Appellant,**

**v.**

**NORTH COLORADO MEDICAL CENTER, INC., a Colorado corporation commonly referred to as NCMC and its Board of Directors; Richard H. Stenner, President; Karl B. Gills, Executive Vice–President; Alyce Kantner, former Director of Medical Services; and Pat (Wilson) Kern, Director of Cardiovascular Services, Defendants–Appellees.**

No. 98CA1407.

Colorado Court of Appeals,
Div. IV.

Dec. 9, 1999.

As Modified on Denial of Rehearing
April 13, 2000.

Certiorari Granted Nov. 6, 2000.

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S.1999.

Anthony, Nicholas & Sharpe, LLC., Phillip A. Nicholas, Jason M. Tangeman, Steven K. Sharpe, Laramie, Wyoming, for Plaintiff–Appellant.

Gallo, Reinan & Marek, LLC., J.M. Reinan, F. James Gallo, Sherman Marek, William L. Burk, Lisa M. Horvath, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge ROTHENBERG.

Plaintiff, Dr. William John Nicholas, appeals a summary judgment determining that: (1) defendants, North Colorado Medical Center, Inc. (NCMC), Karl Gills, and Alyce Kantner, were not state actors for purposes of liability under 42 U.S.C. § 1983 (1995); and (2) with respect to Nicholas' state contract and tort claims, defendants were immune from liability for damages under the federal Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101, et seq. (1995), and also immune from suit and liability for damages under the Colorado Professional Review of Health Care Providers Act (CPRA), § 12–36.5–101, et seq., C.R.S.1999. We reverse and remand for further proceedings.

## I. Facts

Nicholas is a licensed physician specializing in the practice of invasive cardiology and angioplasty. Invasive cardiology involves placing catheters, or small tubes, into the blood vessels of the heart in order to determine whether blockages exist in those vessels. Angioplasty is a subspecialty of invasive cardiology involving the use of a catheter with a balloon on the tip to prevent heart attacks. Invasive cardiology is practiced in a cardiac catheterization lab.

In 1991, Nicholas' privilege to practice in NCMC's cardiac catheterization lab was summarily suspended as the result of an investigation into the quality of his practice. Problems with Nicholas' practice had been brought to the attention of NCMC's Department of Medicine Quality Assurance Committee (also referred to as the Quality Assessment Committee). Three of Nicholas' patients had suffered strokes in a relatively short period of time and one had died. There also was concern over Nicholas' ability properly to keep medical records.

The Quality Assurance Committee, composed of physicians chosen by the medical staff, perceived a problem and had Nicholas' practice reviewed by an outside physician who returned a report critical of Nicholas and the entire NCMC cardiac catheterization lab. The Quality Assurance Committee turned the matter over to NCMC's Credentials Subcommittee, recommending that Nicholas be proctored.

The Credentials Subcommittee was a subcommittee of the Board of Directors of NCMC composed of a majority of physicians, none of whom was in direct competition with Nicholas. The Credentials Subcommittee conducted further review and directed the President of the Hospital to suspend Nicholas' privileges pending an investigation.

Following an investigation, the Credentials Subcommittee found problems with Nicholas' practice, including poor judgment and the inability to maintain proper records. It recommended that his privileges be suspended for a year, after which he could reapply.

Nicholas appealed to NCMC's Fair Hearing Panel which was composed of three physicians, none of whom had anything to do with the investigation or was in direct competition with Nicholas. The Panel generally cleared Nicholas of wrongdoing, except with regard to his record-keeping, and recommended that he be proctored for a year.

Nicholas and the Subcommittee appealed the Panel's findings and recommendations to the House Committee, which under NCMC's bylaws consisted of three or more members of the Board of Directors. There was no requirement that any member be a physician. The House Committee was charged with the task of making such recommendations to the

Board as it deemed appropriate. The House Committee included members who were also on the Credentials Subcommittee.

After hearing arguments, the House Committee found that: (1) the Credentials Subcommittee and the Fair Hearing Panel had agreed on Nicholas' inability properly to maintain medical records in his cases; and (2) the inability to maintain clear records interfered with quality medical care. The House Committee recommended to the Board of Directors that Nicholas' privileges be suspended for a year, a recommendation which the Board adopted.

Nicholas then appealed the Board of Directors' decision to the state Committee on Anticompetitive Conduct. Following a hearing, that committee concluded that the Board's decision to suspend Nicholas was proximately caused by the hostility and the anti-competitive feeling of another NCMC cardiologist, rather than by a desire to improve patient care. The Committee on Anticompetitive Conduct ordered Nicholas' privileges reinstated and that decision was upheld on appeal. *See Nicholas v. North Colorado Medical Center, Inc.,* 902 P.2d 462 (Colo.App. 1995), *aff'd, North Colorado Medical Center, Inc. v. Committee on Anticompetitive Conduct,* 914 P.2d 902 (Colo.1996).

Following the reinstatement of his privileges, Nicholas filed this action against NCMC and certain of its administrators seeking damages plus injunctive and declaratory relief. His claims for injunctive and declaratory relief were dismissed by the trial court and Nicholas does not appeal that dismissal. He appeals only from the dismissal of his claim for damages under 42 U.S.C. § 1983, and from the dismissal of his remaining state claims against NCMC and two of its administrators, defendants Karl Gills and Alyce Kantner.

II. State Action under 42 U.S.C. § 1983

■ With regard to Nicholas' § 1983 claim, the trial court ruled that NCMC, a Colorado nonprofit corporation, was a private hospital, and therefore, that its actions and those of the other defendants did not constitute state action for purposes of § 1983. On that basis, the court granted summary judgment in favor of defendants and dismissed the federal claim.

Nicholas contends that NCMC's decision to suspend his privileges was professional peer review under CPRA, and constituted state action for the purposes of § 1983 liability. We agree.

■ In order for there to be liability under § 1983, "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482, 495 (1982).

■ There is state action when the alleged deprivation of constitutional rights was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co., supra,* 457 U.S. at 937, 102 S.Ct. at 2754, 73 L.Ed.2d at 495.

■ In addition, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co., supra,* 457 U.S. at 937, 102 S.Ct. at 2754, 73 L.Ed.2d at 495; *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442 (10th Cir.1995) (under all of the state action tests, the conduct causing the deprivation of a federal right must be fairly attributable to the state).

■ The use of professional review committees is an extension of the authority of the Colorado State Board of Medical Examiners. Section 12–36.5–103(3)(a), C.R.S.1999. The State Board of Medical Examiners is a creature of statute whose members are appointed by the governor, and is an arm of the state. *See* § 12–36–103, C.R.S.1999. Accordingly, when it is performing peer review activities, the governing board of a hospital is "clothed with the status of a state agency." *Nicholas v. North Colorado Medical Center, Inc., supra,* 902 P.2d at 466; *see* Yu, *The Committee on Anticompetitive Conduct: New Agency on the Block,* 21 Colo. Law. 31 (January 1992).

Here, in a March 1993 order denying defendants' motion to dismiss, the trial court initially rejected defendants' claim that no state action was involved because NCMC was a private hospital. The trial court concluded that it made no difference whether NCMC was private or public and that when the hospital engaged in professional review, it constituted state action. The court explained that:

The clear import of CRS 12–36.5–101 et seq. is to make the licensure, discipline, and professional review of persons licensed to practice medicine a matter of state control. Professional review committees act as an arm or division of the state board of medical examiners.

In December 1997, however, the trial court reversed its earlier ruling, concluding that "professional peer review at a private hospital did not qualify as 'state action' for [the] purposes of 42 U.S.C. § 1983." The court explained that this contrary result was required by the recent announcement of *Berg v. Shapiro*, 948 P.2d 59 (Colo.App.1997).

In *Berg v. Shapiro, supra*, a division of this court held that professional peer review at a private hospital was *not* state action for purposes of § 1983 liability. But, in so holding, the panel there specifically distinguished *Nicholas v. North Colorado Medical Center, Inc., supra*, noting that *Nicholas* involved anticompetitive conduct and *Berg* did not.

The distinction made by the panel in *Berg v. Shapiro, supra*, is not without significance. While peer review has been deemed to be essential to quality medical care, physicians engaging in professional review proceedings have been concerned that they might be accused by the disciplined physicians of engaging in anticompetitive acts and later sued for violating federal antitrust laws. *See Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988).

Federal decisions have held that the antitrust laws are applicable to hospital peer review decisions unless: (1) the challenged restraint is articulated clearly and expressed affirmatively as state policy; and (2) the anticompetitive conduct is actively supervised by the state itself. *Patrick v. Burget, supra.*

In Colorado, the CPRA and the creation of the Committee on Anticompetitive Conduct were intended, among other things, to insulate physicians from antitrust liability arising from their participation in peer review proceedings, thus allowing those engaging in peer review to assert the defense of state action immunity. As one commentator explained:

The CPRA was enacted, in part, to implement the federal Health Care Quality Improvement Act of 1986 ("HCQIA"). The CPRA also created a new, little known state agency called the Committee on Anticompetitive Conduct ("Committee")

. . .

The CPRA addresses antitrust liability directly by granting to participants in peer review organizations a qualified immunity from suit, civil or criminal, by the physician who is under review. However, as if the statutory immunity were insufficient, the CPRA also tries to qualify the peer review process as "state action" exempt from liability under the Sherman Act. The creation of the Committee is undoubtedly a response to *Patrick v. Burget*, a landmark case in the application of the antitrust laws and the state action exemption from antitrust liability to medical peer review activities.

Yu, *The Committee on Anticompetitive Conduct: New Agency on the Block, supra*, 21 Colo. Law. at 31.

▮ Ironically, this statutory scheme insulates physicians from antitrust liability arising from their participation in peer review proceedings, but also makes them state actors for the purposes of § 1983. Immunity under § 1983 is governed by federal law, and state law cannot provide immunity from suit for federal civil rights violations. *See Wallis v. Spencer*, 193 F.3d 1054 (9th Cir.1999).

We therefore conclude that NCMC and its Board of Directors, in suspending Nicholas' privileges, were performing peer review activities which were actively supervised by the state. Hence, NCMC and its Board of Directors were clothed with the status of a state agency. *See Nicholas v. North Colorado Medical Center, Inc., Supra.* To the ex-

tent *Berg v. Shapiro, supra,* is irreconcilable with this conclusion, we decline to follow it.

The trial court correctly ruled that the defendants' actions constituted state action which may give rise to liability under § 1983, and it erred later in reversing that ruling and in dismissing Nicholas' § 1983 claim.

Given our conclusion that the peer review activities here constituted state action, we need not consider Nicholas' additional contention that NCMC is a public hospital and that its decision to suspend his privileges constituted state action for that reason also. *See Milo v. Cushing Municipal Hospital,* 861 F.2d 1194 (10th Cir.1988) (holding that a private corporation was a public hospital for purposes of § 1983 liability); *Jatoi v. Hurst–Euless–Bedford Hospital Authority,* 807 F.2d 1214 (5th Cir.1987) (concluding that hospital was a state actor because the public entity that owned it retained control of and responsibility for the hospital).

### III. Deprivation of Federal Rights

Defendants contend that, even if there was state action, Nicholas has failed as a matter of law to show he was deprived of any federal constitutional or statutory rights under the color of state law. According to defendants, the dismissal of Nicholas' § 1983 claim by summary judgment was therefore justified on that basis. In response, Nicholas maintains that he was deprived of his right to the procedural due process required by the United States Constitution. We agree with Nicholas.

For Nicholas to prevail on his § 1983 claim, apart from showing state action, he must show he was deprived of a federal constitutional or statutory right under the color of state law. To invoke the protections of due process, he must establish that he was deprived of a constitutionally protected interest. *Setliff v. Memorial Hospital of Sheridan County,* 850 F.2d 1384 (10th Cir.1988).

### A. Constitutionally Protected Interest

Medical staff privileges have been recognized to be a property interest protected by the Fourteenth Amendment, particularly when they may only be limited or

revoked after a hearing. *See Setliff v. Memorial Hospital, supra.*

Nicholas was not a member of the active medical staff of NCMC, but NCMC's bylaws give the same due process protection in an action to suspend a provisional member of the medical staff as is given to an active member. Therefore, we conclude Nicholas had a protected property interest in his medical staff privileges. *But see Draghi v. County of Cook,* 184 F.3d 689 (7th Cir.1999) (a provisional member of the medical staff had no constitutionally protected property interest in his hospital privileges where bylaws of the hospital limited the rights of provisional appointees).

In addition, the liberty interest protected by due process includes an individual's freedom to earn a living. *Setliff v. Memorial Hospital of Sheridan County, supra; see Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Because the suspension of privileges seriously injured Nicholas' professional reputation and directly affected his ability to find employment as a physician, he also had a liberty interest in his staff privileges.

### B. Procedural Due Process

Procedural due process requires that a party be given notice and an opportunity to be heard. It also requires fundamental fairness in procedure. Administrative agencies have the same obligation as courts to be fundamentally fair to individuals in the resolution of legal disputes involving governmental action that threatens to deprive an individual of a constitutionally protected interest. *deKoevend v. Board of Education,* 688 P.2d 219 (Colo.1984).

The kind of procedure required will vary according to the situation, but there must always be "some type of neutral and detached decision maker." *deKoevend v. Board of Education, supra,* 688 P.2d at 227.

In *deKoevend,* the Colorado Supreme Court held that this requirement of due process was violated when two interested parties who had first brought the charges against the plaintiff were allowed to sit in on the board's deliberations. Even though neither

party was a member of the board or participated in the decision, the court concluded that their presence nevertheless "violated deKoevend's due process right to a fair and impartial determination by the board." *deKoevend v. Board of Education, supra,* 688 P.2d at 228.

[12] Similarly, here, Nicholas asserts that several members of the Credentials Subcommittee who had participated in the investigation of his practice were also members of the House Committee, and that this procedure violated due process as in *deKoevend.* We agree.

The Board of Directors, as NCMC's governing body, was responsible for the final decision to suspend Nicholas' privileges. The House Committee was appointed by NCMC's Board of Directors and acted as an arm of the governing body when it recommended suspension of Nicholas' privileges.

The record reflects that at least one member of the Credentials Subcommittee participated in the House Committee's decision, thus combining investigative and deliberative functions. Members of the House Committee were also on the Board of Directors. These members of the House Committee had already voted in favor of suspension and their presence raises a significant concern that they may have prejudged the facts of Nicholas' case. *See Tepley v. Public Employees Retirement Ass'n,* 955 P.2d 573 (Colo.App.1997) (holding that PERA improperly prejudged the evidence and thus deprived Tepley of due process when PERA's final decision was made by the same persons who initially had denied Tepley's application).

Nor was this an oversight by NCMC. Nicholas' counsel wrote a letter specifically requesting that members of the Credentials Subcommittee be disqualified from also sitting on the House Committee during his appeal. But, even after the due process issue was brought to its attention, NCMC did not disqualify one member of the Credentials Subcommittee from dual participation in the House Committee's decision.

We therefore reject defendants' argument that Nicholas failed to show he was deprived of the procedural due process required by the United States Constitution. To the contrary, we conclude as a matter of law that NCMC's procedure violated Nicholas' due process right to a fair and impartial determination by the Board, a clearly established right. *See deKoevend v. Board of Education, supra.*

Given our conclusion, we do not determine the propriety of the behavior of another member of the Credentials Subcommittee, who did not actually participate in the decision, but urged the House Committee to adopt the Credentials Subcommittee's recommendation of suspension.

### IV. Immunity from State Claims under HCQIA

■ Nicholas contends the trial court erred in finding that the defendants were immune from damages on Nicholas' state claims under HCQIA. We conclude there is a genuine issue of fact whether the defendants violated the procedural requirements of HCQIA, and remand for further proceedings.

Congress enacted HCQIA to encourage peer review activities, "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384; *see Sugarbaker v. SSM Health Care,* 190 F.3d 905 (8th Cir. 1999); *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318 (11th Cir.1994).

As the court explained in *Bryan v. James E. Holmes Regional Medical Center, supra,* 33 F.3d at 1321:

HCQIA is designed to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits. The statute attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action; accordingly, Congress granted immunity from monetary damages to participants in properly conducted peer review proceedings while preserving causes of action for

injective or declaratory relief for aggrieved physicians.

The issue of HCQIA arose when the defendants claimed immunity under HCQIA as a defense to Nicholas' state claims. The parties agree that HCQIA provides no immunity for damages arising from Nicholas' federal claim under 42 U.S.C. § 1983. *See* 42 U.S.C. § 11111(a)(1)(D) ("The preceding sentence [conferring immunity from damages] shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons . . .").

However, the defendants asserted in a motion for summary judgment that HCQIA's immunity provisions insulated them from any damages arising from Nicholas' state tort and contract claims. The trial court agreed and granted summary judgment for the defendants on all of the remaining state claims.

42 U.S.C. § 11112(a) requires that a professional review action be taken: (1) in the reasonable belief that the action was in furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures; and (4) in the reasonable belief that the action was warranted by the facts. If these requirements are met, HCQIA provides immunity from damages. *See* 42 U.S.C. § 11111(a).

The standard for summary judgment under HCQIA is whether a reasonable jury, viewing the facts in the best light for the plaintiff, might conclude that the plaintiff has shown by a preponderance of the evidence that a defendant's actions are outside the scope of 42 U.S.C. § 11112(a). Any disputed facts must be sent to the jury as special interrogatories. *Bryan v. James E. Holmes Regional Medical Center, supra.*

Thus, we must determine whether, viewing the facts in the light most favorable to Nicholas, a reasonable jury could find that NCMC's actions were outside the scope of 42 U.S.C. § 11112(a). If so, summary judgment was improper.

In our view, a reasonable jury could agree with the Committee on Anticompetitive Conduct's determination that the action against Nicholas was not taken in the reasonable belief that it was necessary to further quality health care. A jury also could find that NCMC's Board of Directors did not make a reasonable effort to obtain the facts of the matter before suspending Nicholas, and that NCMC thereby forfeited the protection of HCQIA.

We conclude that, because there are genuine issues of material fact which should be resolved by the jury by the submission of special interrogatories, summary judgment should not have been granted on the issue of the defendants' immunity from damages under HCQIA. *See Bryan v. James E. Holmes Regional Medical Center, supra.*

## V. Immunity from State Claims under CPRA

The trial court also found the defendants were immune from suit on Nicholas' state claims based on CPRA, and granted summary judgment on that basis in favor of the defendants. Nicholas contends the trial court erred in granting such immunity. Because we conclude as a matter of law that the procedures afforded Nicholas did not comply with the requirements of CPRA, we agree.

The standard of review for statutory construction is *de novo*. *Watson v. Vouga Reservoir Ass'n,* 969 P.2d 815 (Colo.App. 1998).

CPRA grants participants in the professional review process immunity from suit if the review is conducted in accordance with the statute's requirements. Section 12–36.5–105, C.R.S.1999. Grants of immunity are strictly construed. *Cf. Walton v. State,* 968 P.2d 636 (Colo.1998) (interpreting the Governmental Immunity Act, which provides immunity from suit); *Lyons v. City of Aurora,* 987 P.2d 900 (Colo.App.1999) (also applying the Governmental Immunity Act).

In order for members of professional review committees to be immune from suit under CPRA, they must have made a reasonable effort to obtain the facts of the matter. Also, they must have acted in the reasonable belief that the action taken was warranted by the facts, and otherwise have acted in good faith. Witnesses and other participants in

the professional review action must merely have acted in good faith. Section 12–36.5–105(1). For the governing board and its individual members to be immune from suit, they also must have acted in good faith. Section 12–36.5–105(2).

■ Good faith includes reliance on the recommendations of the professional review committee, and the reasonable belief that the action taken was warranted by the facts. Good faith will not be presumed if the board or a member has knowledge that would make reliance on the committee's recommendations unwarranted. Section 12–36.5–105(2).

■ A professional review committee must be composed of a majority of licensed physicians. Section 12–36.5–104(2), C.R.S. 1999. For a professional review committee to be approved under the CPRA, it must operate according to written bylaws, policies, or procedures which are in compliance with CPRA and which have been approved by the committee's governing board. Section 12–36.5–104(4).

The bylaws of an approved professional review committee must provide the following safeguards: (1) a hearing if the findings of the committee are adverse to the physician; (2) no person who has participated in the course of the investigation may be a member of the hearing committee; (3) the physician shall be given reasonable notice of the hearing and have the right to counsel; (4) after the hearing, the committee shall make recommendations to the governing board; and (5) a copy of the recommendations shall be given to the physician who then must have the right to appeal the committee's findings and recommendations to the governing board. Section 12–36.5–104(7).

The governing board must adopt written bylaws providing a right to appeal to the board. The physician must have the right to appear before the board, to be represented by counsel, and to offer such argument on the record as he or she deems appropriate. The bylaws may provide that the appeal be heard by a committee of not fewer than three members of the governing board. Section 12–36.5–104(8).

Section 12–36.5–104(7)(b) provides that:

*Any person who has participated in the course of any investigation shall be disqualified as a member of the committee at any hearing held pursuant to paragraph (a) of this subsection (7),* but such person may participate as a witness in such hearing. (emphasis added)

Subsection (7)(a) states in relevant part that:

If the findings of any investigation indicate that the physician who is the subject of the investigation is lacking in qualifications, has provided substandard or inappropriate patient care, or has exhibited inappropriate professional conduct, *the professional review committee shall hold a hearing ... to consider the findings; except that, if the professional review committee is submitting its findings to another professional review committee for review, only one hearing shall be necessary prior to any appeal before the governing body.*

Section 12–36.5–104(7)(a) (emphasis added).

Here, the defendants admit that two individuals were members of the Credentials Subcommittee which investigated Nicholas and of the House Committee which recommended the suspension of Nicholas' privileges. In addition, one of these individuals was a member of the Board of Directors which adopted the House Committee's recommendation.

The defendants maintain that despite the multiple roles of these individuals, the House Committee was not required to comply with § 12–36.5–104(7)(b), because it is not a "professional review" committee. Although we conclude that the House Committee acted as an arm of the governing body, rather than as a professional review committee, we nevertheless conclude as a matter of law that the statute was violated and that the procedures afforded Nicholas did not comply with the requirements of CPRA.

CPRA maintains a clear distinction between professional review or peer review committees and the governing body that makes the final decision. *See* § 12–36.5–103(1), C.R.S.1999; § 12–36.5–104(7)(a), (d), and (e); § 12–36.5–104(8)(a); § 12–36.5–104(10)(a); § 12–36.5–104(12); § 12–36.5–

104(13); § 12–36.5–104(14); and § 12–36.5–105.

This distinction between professional review committees and the governing body, together with the specific requirement that investigators not sit on a hearing held by the professional review committee, leads us to the conclusion that CPRA requires that no participant in the investigation be a member of the body hearing the appeal from the investigation.

The Board of Directors, as NCMC's governing body, was responsible for the final decision to suspend Nicholas' privileges. The House Committee was appointed by the Board, and recommended that Nicholas' privileges be suspended. Thus, while the final decision on privileges was left to the Board of Directors, the House Committee acted as an arm of the governing board of NCMC for the purposes of § 12–36.5–104(8)(b).

We have previously concluded that allowing members of the Credentials Subcommittee also to participate in the decisions of the House Committee and the Board of Directors violated the due process required by the Constitution. *See deKoevend v. Board of Education, supra.* We construe CPRA as affording the same protection.

The construction pressed by defendants – that the House Committee was not required to comply with § 12–36.5–104(7)(b) because it is not a professional review committee—would allow individuals who participated in the investigation of disciplinary charges against a physician also to serve on the deliberative body that recommended sanctions against that physician. In our view, it would render CPRA unconstitutional under the Due Process Clauses of the United States and Colorado Constitutions. *See deKoevend v. Board of Education, supra.*

When two statutory constructions are possible, one constitutional and the other unconstitutional, we must choose the one that renders the statute constitutional. *See Kinder v. Industrial Claim Appeals Office,* 976 P.2d 295 (Colo.App.1998).

We therefore conclude as a matter of law that the procedures employed by NCMC violated the due process required by CPRA.

Hence, the trial court erred in finding that NCMC's procedures were in substantial compliance with CPRA.

## VI. Conclusion

In summary, we conclude that the defendants are state actors for the purposes of § 1983 liability, and that Nicholas has pled facts sufficient to support such a violation because the procedures provided to him by NCMC violated the due process required by the federal Constitution.

As to Nicholas' state claims, we conclude there are genuine issues of material fact which preclude summary judgment on the issue of defendants' statutory immunity under HCQIA. With regard to the issue of immunity under CPRA, we further conclude as a matter of law that the procedures provided to Nicholas by defendants violated the due process required by CPRA. Accordingly, statutory immunity is unavailable to defendants under CPRA on Nicholas' state claims.

The judgment is reversed, and the cause is remanded for further proceedings consistent with the views set forth in this opinion.

Judge JONES and Judge BRIGGS concur.