NORTH COLORADO MEDICAL CEN-
TER, INC., a Colorado non-profit corpo-
ration; and the Governing Board of Di-
rectors of the North Colorado Medical
Center, Petitioners,

v.

THE COMMITTEE ON ANTICOMPETI-
TIVE CONDUCT and William John
Nicholas, M.D., Respondents.

No. 95SC256.

Supreme Court of Colorado,
En Banc.

April 1, 1996.

Gorsuch Kirgis L.L.C., Malcolm M. Murray, Ellen Elizabeth Stewart, Denver, for Petitioners.

No appearance on behalf of Respondent The Committee on Anticompetitive Conduct.

Nicholas Law Offices, Philip A. Nicholas, Lillian N. Sharpe, Laramie, Wyoming, for Respondent William John Nicholas, M.D.

Faegre & Benson, Gerald A. Niederman, Natalie Hanlon–Ley, Denver, for Amicus Curiae American Hospital Association.

Yu Stromberg Cleveland, P.C., Frederick Y. Yu, Denver, for Amicus Curiae Colorado Hospital Association.

Chief Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the decision in *Nicholas v. North Colorado Medical Center, Inc.*, 902 P.2d 462 (Colo.App.1995), in

which the court of appeals held that the Colorado State Board of Medical Examiners committee on anticompetitive conduct was not bound to adopt federal antitrust law in defining unreasonable anticompetitive conduct and that the proximate cause analysis was appropriate for determining whether unreasonable anticompetitive conduct had occurred. We affirm.

## I.

In August of 1989, the respondent, William John Nicholas, M.D., joined the partnership of the Greeley Medical Clinic as an invasive cardiologist. At the same time, Nicholas joined the medical staff of the North Colorado Medical Center (NCMC), an entity unrelated to the Greeley Medical Clinic. NCMC granted Nicholas provisional privileges to work in its cardiac catheterization laboratory, the only laboratory of its kind in Greeley. NCMC also granted Nicholas privileges to perform invasive cardiology procedures.

In September of 1990, Nicholas was terminated from the Greeley Medical Clinic; this termination had no official effect on his independent status as a staff member of NCMC. Nevertheless, during the next several months, a peer review process of Nicholas' practice was conducted at NCMC pursuant to section 12–36.5–104, 5B C.R.S. (1991). The Medical Quality Assessment Committee of NCMC recommended to the Credentials Subcommittee that Nicholas be evaluated by an independent physician to review his records and observe his performance in the cardiac catheterization laboratory. The independent physician filed a report which was critical of Nicholas' basic catheterization skills and clinical judgment. Consequently, in July of 1991, NCMC's Credentials Subcommittee suspended Nicholas' invasive cardiology privileges pending further investigation. In November of 1991, the Credentials Subcommittee recommended that Nicholas be retained on the medical staff of NCMC but not be granted privileges to practice invasive cardiology.

Pursuant to NCMC's bylaws, Nicholas requested and was granted a hearing before a Fair Hearing Panel (Panel); the hearing was conducted in May of 1992. At the conclusion of that hearing, the Panel concluded that many of the allegations of substandard care against Nicholas had not been proven. The Panel determined that although Nicholas had previously been technically deficient with respect to certain invasive procedures, his practice had improved to the point where his judgment and proficiency were within generally acceptable standards. The Panel found that Nicholas was deficient only in his recordkeeping practices, and therefore recommended that his invasive cardiology privileges be reinstated, subject to a one-year period of probation and monitoring to include a review of his recordkeeping practices.

The Panel's report was reviewed by the House Committee of NCMC's Governing Board of Directors (House Committee). The House Committee voted to reject the Panel's recommendations, and instead recommended to the co-petitioner, NCMC's Governing Board of Directors (Board), that Nicholas be retained on the medical staff conditioned upon further review of his practice for a probationary period of up to one year, at which time Nicholas could apply for reinstatement of his invasive cardiology privileges. The Board adopted the House Committee's recommendations.

In June of 1992, Nicholas filed a complaint with the co-respondent, the Colorado State Board of Medical Examiners committee on anticompetitive conduct (Committee), appealing the decision of the Board and alleging that the loss of his invasive cardiology privileges at NCMC resulted from unreasonable anticompetitive conduct in violation of section 12–36.5–106(7), 5B C.R.S. (1991). Nicholas specifically alleged (1) that the anticompetitive conduct was initiated by Dr. James Beckman, another invasive cardiologist who worked at both Greeley Medical Clinic and NCMC; (2) that a number of persons within the Greeley medical community were unwitting accomplices to the anticompetitive conduct which resulted in an unfair peer review process; (3) that Nicholas' invasive cardiology privileges and privileges in the catheterization laboratory were suspended and eventually terminated because of such concerted anticompetitive conduct; and (4) that without such privileges, Nicholas was precluded from

practicing cardiology in Greeley, resulting in an adverse impact upon competition within the Greeley area.

A hearing was held before the Committee on May 3, 1993. In its final order, the Committee determined that although the term "unreasonable anticompetitive conduct" is not defined in the Colorado statute, it must be defined with reference to principles of antitrust law as applied to the health care field. The Committee further determined that Nicholas bore the burden of proving, pursuant to section 12–36.5–106(7) & (9), 5B C.R.S. (1991), that the action of the Board resulted from unreasonable anticompetitive conduct. To prove that unreasonable anticompetitive conduct occurred, the Committee stated that Nicholas must establish the following factors: (1) there was a concerted action of two or more entities; (2) such action was intended to create or resulted in an adverse effect upon competition; (3) the anticompetitive conduct was unreasonable; and (4) the final action of the Board resulted from the unreasonable anticompetitive conduct.

The Committee found that all four elements were established by a preponderance of the evidence. The Committee stated that it was convinced by the totality of the circumstances, and by its assessment of the credibility of the witnesses, that Beckman had a plan to eliminate Nicholas from the practice of invasive cardiology in the Greeley area and that other persons within NCMC joined in that plan. The Committee further concluded that Nicholas' ability to compete in the invasive cardiology market was destroyed when NCMC denied him invasive cardiology privileges, that the dominant purpose of the concerted action was not quality assurance, and that the final action of the Board resulted from unreasonable anticompetitive conduct.

On appeal, pursuant to section 12–36.5–201(10)(a) and 24–4–106(11), 5B C.R.S. (1991), the court of appeals affirmed the decision of the Committee. *Nicholas v. North Colo. Medical Ctr., Inc.,* 902 P.2d 462 (Colo. App.1995). NCMC petitioned this court for certiorari review of the court of appeals' decision and we granted certiorari on the following issues: (1) whether the court of appeals erred by failing to give presumptive effect to the record of actions of the Governing Board of Directors of the North Colorado Medical Center; (2) whether the court of appeals erred in its application of standards for, and its definition of, the term "unreasonable anticompetitive conduct" as that term is used in section 12–36.5–106, 5B C.R.S. (1991); and (3) whether the court of appeals erred in utilizing a proximate cause standard in concluding that anticompetitive conduct occurred in this case.

## II.

We first determine whether the court of appeals erred by failing to give presumptive effect to the record of actions of NCMC's Board. The court of appeals determined that NCMC was not entitled to a specific presumption that its professional review activities were undertaken for the purpose of assuring quality care and patient safety. However, the court of appeals found that the final decision of NCMC's Board is entitled to a presumption of validity and regularity, a presumption which the court concluded was sufficiently recognized and given appropriate weight by the Committee.

### A.

The Colorado Professional Review Act (CPRA) itself does not specifically mandate a presumption that professional review activities are undertaken for the purpose of assuring quality care and patient safety. However, the federal counterpart to the CPRA, the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101 to – 52 (1986), expressly contains such a presumption. Nevertheless, we hold that the Colorado statute should not be interpreted to include the federal statute's presumption for two reasons.

First, the federal statute's presumption that professional review action is taken in the furtherance of quality health care arises in a context different from the one before us. Under the HCQIA, the federal presumption is used to determine whether liability limitations for the reviewing entity are triggered, an issue not raised in the current case. Sec-

ond, nowhere in the CPRA does the Colorado legislature incorporate the presumption of the HCQIA. Instead, the CPRA merely indicates that the Colorado statute is intended to be responsive to the federal statute. § 12–36.5–201, 5B C.R.S. (1991). Thus, the court of appeals properly concluded that the CPRA does not include a specific presumption that professional review activities are undertaken for the purpose of assuring quality care and patient safety.

### B.

■ Although NCMC's Board is not entitled to the specific presumption that its professional review activities are undertaken for the purpose of assuring quality care and patient safety, the Board's decision is entitled to a presumption of validity and regularity. *People v. Gallegos,* 692 P.2d 1074, 1078 (Colo. 1984) (holding that an administrative agency decision is presumptively valid). Nevertheless, we approve the reasons delineated by the court of appeals supporting its conclusion that the Committee sufficiently recognized the presumption of validity and regularity accorded to the Board's action. We therefore affirm the court of appeals' holding in this matter.

### III.

We next determine whether the court of appeals erred in the application of standards for, and its definition of, the term "unreasonable anticompetitive conduct" as that term is used in section 12–36.5–106. NCMC contends that the court of appeals erred because it should have accorded greater deference to federal antitrust principles when construing the term "unreasonable anticompetitive conduct". Section 12–36.5–106(7) provides:

> Any physician who is the subject of a final action by a governing board, which action results in the denial, termination, or restriction of privileges at or membership in or participation in an organization, and who believes that such action resulted from unreasonable anticompetitive conduct shall have, as his sole and exclusive remedy, direct review of the record by the committee. Such review shall be limited to the sole issue of whether such final board action resulted from unreasonable anticompetitive conduct.

The term "unreasonable anticompetitive conduct" is not statutorily defined.

■ A state court is not bound to follow federal case law interpreting a federal statutory definition when the state statute is distinguishable from the federal statute. *Insul-Lite Window & Door Mfg., Inc. v. Industrial Comm'n,* 723 P.2d 151, 152 (Colo.App.1986). Additionally, a court is not bound to follow federal law in construing a state statutory scheme when no authority is found or cited by the parties indicating that federal law prevails. *Brannan Sand & Gravel Co. v. Industrial Claim Appeals Office,* 762 P.2d 771, 774 (Colo.App.1988), *aff'd sub nom. Federico v. Brannan Sand & Gravel Co.,* 788 P.2d 1268 (Colo.1990). Thus, a court may refuse to engraft a federal statutory scheme, with its distinct definitions, policies, and concepts, onto a related state statutory scheme when the court discerns no compelling policy reason to do so. *See id.*

■ In 1986, the United States Congress recognized a national need to encourage professional peer review by adopting the HCQIA, a statute which provides qualified immunity to those participating in peer review proceedings. 42 U.S.C. §§ 11101 to –52 (1986). In 1988, the Colorado legislature enacted the CPRA, §§ 12–36.5–101 to –203, 5B C.R.S. (1988), which in part duplicates the immunity provided by the HCQIA. However, the legislative purpose of the CPRA extends beyond the HCQIA's purpose of providing immunity to persons involved in peer review proceedings. As the Colorado legislature stated in the CPRA, the statute's purposes include: protection of the public's health, safety, and welfare by regulating competition and unprofessional conduct; use of professional review committees in assisting the state board; encouragement of physicians to participate in peer review proceedings; and other related purposes. § 12–36.5–101 & –103, 5B C.R.S. (1988). Because the purpose of the federal HCQIA is distinguishable from the purposes of the CPRA, the court of appeals properly declined to require the Committee to predicate its findings and

conclusions upon the stringent standards of federal antitrust law. Consequently, the court of appeals did not err in concluding that the term "unreasonable anticompetitive conduct" need not be interpreted in accordance with federal case law.

## IV.

■ Finally, we determine whether the court of appeals erred in utilizing a proximate cause standard in concluding that anticompetitive conduct had occurred in this case. In affirming the court of appeals' holding that strict adherence to federal antitrust principles is not required in determining the existence of unreasonable anticompetitive conduct under the CPRA, we also agree with the court's conclusion that the CPRA's causation requirement need not be analyzed under federal antitrust law. Thus, we look only to the CPRA to ascertain whether proximate cause is the correct standard for determining whether anticompetitive conduct has occurred.

■ Courts must give effect to the intent of the legislature by adopting the statutory construction that best effectuates the purposes underlying the legislative scheme. *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100 (Colo.1995); *M.S. v. People*, 812 P.2d 632, 635 (Colo.1991); *Martinez v. Continental Enters.*, 730 P.2d 308, 315 (Colo. 1986). In reviewing an agency's construction of a statute administered by that agency, courts must first consider whether the legislature has addressed the precise question at issue. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *accord Lamkin v. Bowen*, 721 F.Supp. 263, 267 (D.Colo.1989). If the statute is silent or ambiguous with respect to the specific issue, courts must determine whether the agency's ruling on that issue is based on a permissible construction of the statute. *Id.* The interpretation of a statute by the agency charged with enforcement of that statute is generally entitled to deference.

*City & County of Denver v. Board of Assessment Appeals*, 802 P.2d 1109, 1111 (Colo. App.1990); *see also Huddleston v. Grand County Bd. of Equalization*, 913 P.2d 15, 17 (Colo.1996).

Pursuant to the CPRA, professional review actions by a governing board may not "result[ ] from" unreasonable anticompetitive conduct. Specifically, the CPRA provides:

> If the Committee finds by a preponderance of evidence that the final action of the governing board resulted from unreasonable anticompetitive conduct, it shall issue its final order disapproving and setting aside such action or modifying the action taken by the governing board in whole or in part.

§ 12–36.5–106(9)(k), 5B C.R.S. (1991). NCMC contends that by adopting a proximate cause standard to determine whether the Board's actions "resulted from unreasonable anticompetitive conduct," the court of appeals effectively requires the Committee to permit a physician to continue practicing at a hospital even when professional review proceedings are initiated due to both unreasonable anticompetitive conduct and legitimate concerns such as substandard patient care.

■ We reject NCMC's argument because it was anticipated and addressed by the Colorado legislature. First, the Committee is not required to set aside the governing board's actions in whole. If the Committee finds that an action was the result of unreasonable anticompetitive conduct and it believes that the safety and welfare of patients require that a physician's privileges be restricted, it has the power to fashion an order which does not fully restore the physician's privileges. Second, the CPRA requires that the Committee refer to the Board of Medical Examiners[1] physicians who constitute a clear and present danger to patients. § 12–36.5–106(9)(n), 5B C.R.S. (1991). This requirement assures that physicians subject to professional review actions due to legitimate concerns, such as substandard patient care,

---

1. The board of medical examiners is the entity charged with policing physicians and protecting the public from unqualified practitioners. § 12–36.5–101, 5B C.R.S. (1991). The board of medical examiners acts for the state with ultimate authority and responsibility to govern licensure, discipline, and professional review of persons licensed to practice medicine in Colorado. *Id.*

are properly handled by the appropriate entity.

▮ Furthermore, we reject NCMC's argument that application of the proximate cause standard to section 12–36.5–106 allows incompetent physicians to continue practicing if they merely submit evidence that unreasonable anticompetitive conduct was one of the reasons why professional review proceedings were initiated against them. We disagree because Colorado's proximate cause rule is intended to ensure that casual and unsubstantial causes do not become actionable. In *Smith v. State Compensation Insurance Fund,* 749 P.2d 462 (Colo.App.1987), the Colorado Court of Appeals summarized proximate cause analysis as follows:

> The test for causation is the "but for" test—whether, but for the alleged negligence, the harm would not have occurred. The requirement of "but for" causation is satisfied if the negligent conduct in a "natural and continued sequence, unbroken by any efficient, intervening cause, produce[s] the result complained of, and without which the result would not have occurred."
>
> . . . .
>
> Also, for a plaintiff to prevail on causation, it is necessary to show that the negligence was a "substantial factor" in producing the harm.
>
> . . . .
>
> ". . . Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor. So too, although no one of the contributing factors may have such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor."

*Id.* at 464 (citations omitted).

▮ According to *Smith,* applying a proximate cause analysis to the CPRA would permit physicians to prevail only if professional review proceedings would not have been initiated "but for" the alleged unreasonable anticompetitive conduct. Thus, under a proximate cause analysis, the presence of unreasonable anticompetitive conduct must produce the professional review action at issue, and the review action would not have occurred in the absence of such anticompetitive conduct. Moreover, a proximate cause analysis requires that the alleged unreasonable anticompetitive conduct be a substantial factor in bringing the professional review proceedings at issue. Hence, if professional review proceedings are brought due to a combination of reasons, such as unreasonable anticompetitive conduct and substandard care by the physician, then only the predominant reason is considered to be a substantial factor satisfying the proximate cause standard. Contrary to NCMC's assertion, therefore, the "but for" test and the substantial factor requirement inherent in the proximate cause analysis indicate that the proximate cause analysis does not allow incompetent physicians to continue practicing merely because they submit evidence of unreasonable anticompetitive conduct. We thus affirm the court of appeals' determination that the Committee correctly applied the proximate cause analysis to the CPRA.

### V.

For the foregoing reasons, we hold that (1) the court of appeals properly declined to give presumptive effect to the record of actions of NCMC's Board; (2) the court of appeals did not err in its application of standards for the term "unreasonable anticompetitive conduct" as that term is used in the CPRA; and (3) the court of appeals correctly utilized a proximate cause standard in concluding that anticompetitive conduct occurred in this case. We therefore affirm the court of appeals.