NORTH COLORADO MEDICAL CENTER, INC., a Colorado corporation, commonly referred to as NCMC, and its Board of Directors; Richard H. Stenner, its President; Karl B. Gills, its Executive Vice–President; Alyce Kantner, its former Director of Medical Services; Pat (Wilson) Kern, its Director of Cardiovascular Services; and Does 1 through 15, Petitioners,

v.

William John NICHOLAS, M.D., Respondent.

No. 00SC418.

Supreme Court of Colorado, En Banc.

June 25, 2001.

As Modified on Denial of Rehearing Aug. 6, 2001.

Law Offices of J.M. Reinan, Jerome M. Reinan, Denver, CO, Attorney for Petitioners.

Anthony, Nicholas, Goodrich & Tangeman, LLC, Philip A. Nicholas, Jason M. Tangeman, Laramie, WY, Attorneys for Respondent.

Yu Stromberg Cleveland, P.C., Frederick Y. Yu, Denver, CO, Attorney for Amicus Curiae Colorado Health and Hospital Association.

Montgomery Little & McGrew, P.C., Patrick T. O'Rourke, Englewood, CO, Attorney for Amicus Curiae Colorado Medical Society.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Nicholas v. North* *Colorado Medical Center, Inc.*, 12 P.3d 280 (Colo.App.1999) (*Nicholas III*).[1] In reversing the trial court's orders for summary judgment, the court of appeals held that the peer review process in a private hospital constitutes state action for the purpose of 42 U.S.C. § 1983. The court of appeals also held that the peer review process did not conform to the requirements of the Colorado Professional Review Act, sections 12–36.5–101 to –203, 4 C.R.S. (2000) (CPRA), and the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101 to 11152 (1995) (HCQIA). We hold that professional peer review conducted in a private medical facility does not constitute state action for the purposes of 42 U.S.C. § 1983. We further hold that the participants in the peer review of Nicholas acted in accordance with the CPRA and HCQIA, and are therefore immune from suit and liability for damages for Nicholas's state contract and tort claims. Accordingly, we reverse the judgment of the court of appeals.

## I.

This case returns to us in the latest stage of what has become a decade-long saga of litigation and administrative proceedings. In 1989, respondent William Nicholas, a licensed physician specializing in invasive and interventional cardiology, joined the medical staff of the North Colorado Medical Center (NCMC) in the facility's heart catheterization lab. Shortly after his arrival, NCMC's Department of Medicine Quality Assurance Committee (QA Committee) received reports of problems with Nicholas's practice. The QA Committee was composed of several NCMC staff physicians, none of whom directly competed with Nicholas. Based on initial concerns over inadequate medical chart documentation, the QA Committee began investigating Nicholas's practice. During the course of the investigation, three of Nicholas's patients suffered strokes, one pa-

---

1. We granted certiorari on the following issues:
 (1) Whether the court of appeals erred in reversing the trial court's dismissal of respondent's claims under 42 U.S.C. § 1983.
 (2) Whether the court of appeals erred in ruling that petitioner violated respondent's due process rights.
 (3) Whether the court of appeals erred in reversing the trial court's order of summary judgment in favor of petitioner pursuant to the HCQIA and CPRA.

tient died, Nicholas's privileges in the heart catheterization lab were suspended, and Nicholas was terminated from his concurrent employment with another medical facility in the Greeley area.

The QA Committee hired an outside physician, Dr. G. David Jang, to conduct an independent review of Nicholas's medical practice. Jang toured the NCMC facility, met with Nicholas and members of the NCMC staff, and reviewed several of Nicholas's patient charts and cardiac catheterization films. Jang subsequently submitted a report that was critical of Nicholas's practice. The QA Committee furnished Nicholas with a copy of Jang's report, and referred the matter to NCMC's Credentials Subcommittee. Like the QA Committee, the Credentials Subcommittee was composed primarily of physicians, none of whom was in direct competition with Nicholas.

The Credentials Subcommittee reviewed Jang's report and interviewed Nicholas. In July 1991 the Subcommittee concluded that allowing Nicholas to continue practicing invasive cardiology posed a risk to patient care at NCMC, and directed NCMC's president to suspend Nicholas's invasive cardiology privileges pending further investigation. Continued investigation uncovered further problems with Nicholas's practice. The Credentials Subcommittee issued a Corrective Action Report recommending that Nicholas be retained on the NCMC staff but not be granted privileges to practice invasive cardiology. The Subcommittee provided Nicholas with written notice of adverse action and his right to request a Fair Hearing pursuant to NCMC's bylaws.

In March 1992, Nicholas was afforded a hearing by NCMC's Fair Hearing Panel. The Panel was comprised of three physicians, none of whom was in direct competition with Nicholas or had anything to do with his investigation. The Panel expressed concern over Nicholas's continued documentation deficiencies, and recommended that he be closely supervised and monitored. The Pan-

el did not recommend, however, that Nicholas's privileges be suspended.

Both Nicholas and the Credentials Subcommittee appealed the Panel's decision to NCMC's House Committee of the Board of Directors. The House Committee considered the Fair Hearing Panel report, evidence produced at the hearing, and the Credentials Subcommittee's Corrective Action Report. The House Committee concluded that Nicholas should be suspended from invasive cardiology privileges and placed on probation for a period not to exceed one year, after which time Nicholas could seek restoration of his invasive cardiology privileges. At a special meeting one week later, NCMC's Board of Directors considered Nicholas's case and ratified the House Committee's recommendations.

In June 1992, Nicholas appealed to the state Committee on Anticompetitive Conduct (CAC), arguing that the suspension of his privileges resulted from unreasonable anticompetitive conduct. Following a hearing, the CAC concluded that Nicholas's loss of privileges was initiated by the hostility and anti-competitive feeling of another NCMC cardiologist, and ordered Nicholas's invasive cardiology privileges reinstated. The CAC's decision was upheld on appeal. *See Nicholas v. North Colo. Med. Ctr., Inc.*, 902 P.2d 462 (Colo.App.1995) (*Nicholas I* ), *aff'd, North Colo. Med. Ctr., Inc. v. Committee on Anticompetitive Conduct*, 914 P.2d 902 (Colo. 1996) (*Nicholas II* ). In 1993, Nicholas applied for and received reinstatement of his Level III cardiology privileges at NCMC.

In addition to filing an appeal with the CAC, Nicholas brought a civil suit against NCMC and certain of its administrators (collectively NCMC), seeking damages as well as declaratory and injunctive relief. After our decision in *Nicholas II,* NCMC filed a motion for summary judgment in the civil suit, asserting in part that Nicholas's claim for damages under 42 U.S.C. § 1983 must fail because NCMC's activities did not constitute state action. NCMC also asserted that Nicholas's state law claims[2] must be dismissed

---

**2.** Nicholas's Third Amended Complaint set forth fifteen claims for relief: (1) declaratory relief; (2) injunctive relief; (3) negligence; (4) breach of contract; (5) willful breach of contract; (6) defamation; (7) intentional infliction of emotional distress; (8) tortious interference with contract;

because NCMC was immune from damages under the CPRA and the HCQIA.

In December 1997, the trial court granted NCMC's motion for summary judgment on the section 1983 issue. The trial court concluded that NCMC was a private corporation and that its actions are not "state action" for the purposes of section 1983. The trial court subsequently held a hearing on the other immunity issues, and granted summary judgment for NCMC on those claims in June 1998.

Nicholas appealed, and the court of appeals reversed each of the summary judgment orders. The court of appeals first held that Nicholas could maintain his section 1983 action, because (1) NCMC is "clothed with the status of a state agency" when performing peer review activities, *Nicholas III*, 12 P.3d at 285, and (2) NCMC's review procedure violated Nicholas's due process right to a fair and impartial determination by the Board. *Id.* at 287. The court of appeals also concluded that NCMC was not immune from state law claims, because NCMC's actions fell or could have fallen outside the scope of the CPRA and the HCQIA. *Id.* at 287, 289.

## II.

We hold that professional peer review conducted in a private medical facility does not constitute state action for the purposes of 42 U.S.C. § 1983. We further hold that the participants in NCMC's peer review of Nicholas acted in accordance with the CPRA and HCQIA, and are therefore immune from suit and liability for damages for Nicholas's state contract and tort claims. Accordingly, we reverse the judgment of the court of appeals.

## A.

### Section 1983 Liability

Section 1983 allows a party to bring a cause of action for an alleged violation of the Fourteenth Amendment and provisions of the Bill of Rights incorporated into the Fourteenth Amendment. *See Scott v. Hern*, 216 F.3d 897, 906 (10th Cir.2000). "The pur-

pose of [section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). To be actionable under section 1983, the challenged conduct must satisfy two conditions. First, the conduct must constitute state action; that is, action under color of state law. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 930–31, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Second, the conduct must deprive the claimant of a federally protected right or interest. *Id.; State v. Nieto*, 993 P.2d 493, 507 (Colo.2000).

The trial court held that NCMC's peer review process was not state action, and that consequently, section 1983 was not applicable. The court of appeals determined that NCMC's peer review both constituted state action and deprived Nicholas of property and liberty interests without due process. *Nicholas III*, 12 P.3d at 286–87. We agree with the trial court that NCMC's professional review of Nicholas did not constitute state action.

### 1. Public vs. Private Entities

Where a section 1983 claim is based on the conduct of a private hospital, the conduct must be "fairly attributable to the state." *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744. A private entity's conduct is fairly attributable to the state only if it meets two criteria: (1) the deprivation is caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible; and (2) the entity charged with the deprivation is fairly said to be a state actor, either by receiving significant aid from state officials, or because the conduct is otherwise chargeable to the state. *Wyatt*, 504 U.S. at 162, 112 S.Ct. 1827; *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744.

Because the tests differ based on public or private status, as an initial matter,

(9) fraud and misrepresentation; (10) breach of duty of good faith and fair dealing; (11) deprivation of rights under 42 U.S.C. § 1983; (12) anti-

competitive conduct; (13) outrageous conduct; (14) abuse of process; and (15) arbitrary, capricious, and unreasonable conduct.

we must determine whether NCMC is a public or private entity. Whether a hospital is a public or private facility is a matter of law. *See Monyek v. Parkway Gen. Hosp., Inc.,* 273 So.2d 430, 431 (Fla.Dist.Ct.App.1973); *Hughes v. Good Samaritan Hosp.,* 289 Ky. 123, 158 S.W.2d 159, 160–61 (1942). The trial court held that NCMC is a private medical facility. The court of appeals did not disturb this conclusion on appeal. *See Nicholas III,* 12 P.3d at 286. While Nicholas now urges us to find that NCMC is a public facility, our review of the undisputed facts in the record leads us to conclude that NCMC is indeed a private hospital as a matter of law for the purpose of section 1983.

▇▇▇ "The principal distinguishing feature of a private hospital is that it has the power to manage its own affairs and is not subject to direct control of a governmental agency." *Peterson v. Tucson Gen. Hosp., Inc.,* 114 Ariz. 66, 559 P.2d 186, 189 (Ct.App. 1976); 41 C.J.S. *Hospitals* § 1 (1991). Private hospitals are also founded and maintained by private persons or a private corporation. *Van Campen v. Olean Gen. Hosp.,* 210 A.D. 204, 205 N.Y.S. 554, 556 (App.Div. 1924). By contrast, a public hospital "is an instrumentality of the state, founded and owned in the public interest, supported by public funds, and governed by those deriving their authority from the state." *Peterson,* 559 P.2d at 189.

[9] The record shows that while originally founded as a county hospital, NCMC was incorporated as a private 501(c)(3) corporation in the mid–1980s. In 1991, prior to the events involving Nicholas, the composition of the hospital's Board of Directors was changed such that only a minority of the directors were appointed by Weld County. The minority of directors that are appointed by the County are entirely independent of the Weld County Board of County Commissioners. The mere presence of public officials on a hospital's board of directors does not by itself render decisions by the hospital state action. *See Crowder v. Conlan,* 740 F.2d 447, 452 (6th Cir.1984).

More important for our inquiry, the record shows that the county does not exhibit significant incidents of control over the hospital's internal affairs. *See Peterson,* 559 P.2d at 189. NCMC's Board of Directors is not subject to the direction of the Weld County Board of County Commissioners, nor is it required to file reports with the Board of County Commissioners. Moreover, the Board of County Commissioners has no influence over how NCMC handles its hospital credentialing matters. A "sufficient nexus" does not exist between the state's relationship to the hospital and its credentialing and disciplinary procedures. *Lubin v. Crittenden Hosp. Ass'n,* 713 F.2d 414, 416 (8th Cir.1983).

Nor does Weld County's ownership of the land underlying the hospital supply a sufficient nexus to render the hospital a public facility. This factor is not significant where the hospital itself has "full and complete charge of [its] management and operation." *Id.* The governing bodies of NCMC demonstrate the requisite independence from the county to make the hospital a private entity.

2. State Action by a Private Entity

▇▇▇ Having concluded that NCMC is a private entity, we must next determine whether its peer review process bears the imprimatur of the government sufficient to constitute state action; that is, whether the state—via statute or another legal mechanism—permitted NCMC to engage in the alleged deprivation of a federal right, and whether NCMC received significant assistance from state officials in creating the alleged deprivation. *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744. We conclude that it does not.

The first prong of the *Lugar* test requires that the alleged deprivation be caused by the exercise of a state-created right or privilege or by a rule of conduct imposed by the state or by a person for whom the state is responsible. *Id.* Put another way, the defendant "must have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (internal quotation marks omitted).

▇▇▇ The peer review of Nicholas fails to meet this definition, for two reasons. First,

"[p]rofessional peer review at private hospitals has not been viewed as the prerogative of the state." *Berg v. Shapiro*, 948 P.2d 59, 61 (Colo.App.1997). Rather, private hospitals had a right at common law to revoke staff privileges of physicians for good cause. *Id.; Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir.1989). Nor does the CPRA's codification of the use of professional review committees, *see* §§ 12–36.5–101 to –105, 4 C.R.S., make the process of professional peer review attributable to the state. Statutory authorization of a pre-existing common law right does not in itself constitute state action. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

Second, the initial prong of the *Lugar* test is not met here because decisions that take place during the peer review process in a private hospital "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Blum v. Yaretsky*, 457 U.S. 991, 1008, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The decision to suspend Nicholas's invasive cardiology privileges was reached through independent criteria, and was "not compelled or even influenced by any state regulation." *Rendell–Baker v. Kohn*, 457 U.S. 830, 841, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

 The second prong of the *Lugar* test requires that the party charged with the deprivation is fairly said to be a state actor. *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744. A private entity is a state actor for section 1983 purposes only if there is a "sufficiently close nexus" between the state and the private entity's conduct "so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Nicholas urges that there is a sufficiently close nexus between the state and NCMC, because the state regulates professional review through the CPRA. We disagree. The CPRA merely provides the procedural format for professional review; it does not set forth the ultimate decision-making criteria. Indeed, the CPRA provides that after a hearing, a professional review committee may make "any recommen-dations it deems necessary" unless federal laws or regulations provide otherwise. § 12–36.5–104(7)(d).

 The Colorado statutes are replete with provisions governing the professions and the delivery of private services to the public. *See, e.g.,* Title 12, 4 C.R.S. (2000). Regulation of a business alone, however, does not itself provide the requisite nexus to create state action, even if that regulation is extensive and detailed. *Jackson*, 419 U.S. at 350, 95 S.Ct. 449; *see also Denver Welfare Rights Org. v. Public Utils. Comm'n*, 190 Colo. 329, 335–37, 547 P.2d 239, 243–45 (1976). Unless the regulation includes specific criteria for evaluation and guidelines as to what action must be taken and when, even the statutory involvement of the state board of medical examiners or another state agency is insufficient to create a sufficiently close nexus between a private hospital and the state. *See Tunca v. Lutheran Gen. Hosp.*, 844 F.2d 411, 413 (7th Cir.1988); *Ezpeleta v. Sisters of Mercy Health Corp.*, 800 F.2d 119, 122 (7th Cir.1986); *Goss v. Memorial Hosp. Sys.*, 789 F.2d 353, 356 (5th Cir.1986).

The court of appeals did not utilize the test stated in *Lugar* and its progeny in determining whether NCMC was a state actor; rather, the court of appeals concluded that because the CPRA qualifies the peer review process as "state action" exempt from liability under the Sherman Antitrust Act, it also makes peer review "state action" for the purposes of section 1983. *See Nicholas III*, 12 P.3d at 285. However, the concept of state action for antitrust purposes is wholly separate from the concept of state action for section 1983 purposes. "State action" under the antitrust laws is defined by a completely different test, created under different circumstances, for different reasons. *See Patrick v. Burget*, 486 U.S. 94, 100, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 104, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (explaining that the Sherman Act was directed toward "individual and not state action" and that state regulatory

schemes cannot violate it).[3] Indeed, to create "state action" for antitrust purposes, the state must overtly and explicitly authorize the private entity to engage in the challenged activity. *Marrese v. Interqual, Inc.*, 748 F.2d 373, 386 n. 18 (7th Cir.1984).

Other courts have also recognized this distinction. In *Ezpeleta*, a case bearing a strong factual similarity to the case before us, the plaintiff physician brought suit against a private hospital, alleging violations of the Sherman Act and section 1983 in her peer review process. The plaintiff argued that because "state action" worked to bar her antitrust claims, it should likewise exist for section 1983. The court disagreed, noting that "[s]imilar sounding phrases often have different meanings when applied in different legal contexts. This is such a case.... [T]he elements required for a cause of action under section 1983 differ from the elements required for state action under the antitrust laws." *Ezpeleta*, 800 F.2d at 122; *see also Marrese*, 748 F.2d at 395 n. 25.

Because Nicholas has not shown that either of the requirements for state action under the *Lugar* test have been satisfied in this case, we conclude that NCMC's peer review process did not constitute state action for the purpose of section 1983. Consequently, we need not determine whether the other elements for section 1983 liability are present, including whether Nicholas was deprived of due process rights. Nicholas may not advance his claim under 42 U.S.C. § 1983.

B.

Immunity from State Claims
under the HCQIA

▮ In addition to its determination regarding section 1983, the trial court separately held that NCMC enjoyed immunity from liability for damages arising from Nicholas's state law claims,[4] because the peer review process had substantially complied with the provisions of the HCQIA and the CPRA. The court of appeals disagreed, holding that the requirements of these statutes were not or may not have been met, and that NCMC did not have immunity. *See Nicholas III*, 12 P.3d at 287–88. We hold that the evidence in the record demonstrates that NCMC complied with the requirements of the HCQIA and the CPRA, and that summary judgment in favor of NCMC was therefore proper. We discuss the HCQIA and the CPRA in turn.

1. Scope and Purpose of the HCQIA

Congress adopted the HCQIA in 1986 in response to the "increasing occurrence of medical malpractice and the need to improve the quality of medical care" in the United States. 42 U.S.C. § 11101(1). The purpose of the statute is to "improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 99–903, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6384, 6384. In furtherance of this goal, the HCQIA grants immunity from actions for damages to participants in medical peer review activities. *See* 42 U.S.C. § 11111; *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1333 (10th Cir.1996); *Pfenninger v. Exempla, Inc.*, 116 F.Supp.2d 1184, 1198 (D.Colo.2000). Congress concluded that absent immunity from potential money damages, including treble damage liability under federal antitrust law, physicians would be discouraged from participating in effective professional peer review. 42 U.S.C. § 11101(4). The HCQIA "is designed to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits." *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1322 (11th Cir.1994).

**3.** The United States Supreme Court "established a rigorous two-pronged test to determine whether anti-competitive conduct engaged in by private parties should be deemed state action and thus shielded from the antitrust laws. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.' Second, the anti-competitive conduct must be 'actively supervised' by the State itself." *Patrick,*

486 U.S. at 100, 108 S.Ct. 1658 (internal citations omitted).

**4.** We do not include among the state law claims Nicholas's claim for anti-competitive conduct. The trial court correctly noted that Nicholas's sole and exclusive remedy for this claim is appeal to the CAC. *See* § 12–36.5–106(7).

The events and parties in this case fall squarely within the scope of the statute. The HCQIA grants immunity to a "professional review body," its members and staff, parties with which it has a contractual relationship, and other participants in a "professional review action" when all the statutory requirements are met. § 11111(a)(1). A "professional review body" is defined as:

> [A] health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.

42 U.S.C. § 11151(11).

■■■ A "professional review activity" is defined as:

> [A]n activity of a health care entity with respect to an individual physician—
>
> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
>
> (B) to determine the scope or conditions of such privileges or membership, or
>
> (C) to change or modify such privileges or membership.

*Id.* § 11151(10). Here, NCMC's QA Committee, Credentials Subcommittee, and Fair Hearing Panel all conducted or assisted in a "professional review activity" as defined by the statute, and therefore all qualify as "professional review bodies" under the statute.[5] Likewise, NCMC's activities fall within the meaning of "professional review action":

> The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of a physician.

*Id.* § 11151(9).

Therefore, if NCMC's peer review process met the standards set forth in the statute, the hospital and participants in the review process are immune from liability for damages.

## 2. Standard of Review for HCQIA Immunity

■■■ Immunity under the HCQIA is a question of law for the court to decide, and may be resolved whenever the record has been sufficiently developed. *Bryan,* 33 F.3d at 1332. We review de novo legal questions concerning immunity. *See Springer v. City & County of Denver,* 13 P.3d 794, 798 (Colo. 2000).

■■■■ The HCQIA creates a rebuttable presumption in favor of immunity, and the plaintiff has the burden of proving by a preponderance of the evidence that the peer review process was not reasonable. 42 U.S.C. § 11112(a); *Brown,* 101 F.3d at 1333; *Pfenninger,* 116 F.Supp.2d at 1199. Reasonableness is measured by an objective standard rather than a subjective, "good faith" standard. *Brown,* 101 F.3d at 1333; *Bryan,* 33 F.3d at 1323.

Section 11112(a) sets out four specific standards for determining whether the participants in a professional review action are entitled to immunity. These standards require that a professional review action be taken:

> (1) in the reasonable belief that the action was in furtherance of quality health care,

---

5. The QA Committee is a committee of the medical staff that assisted in investigating Nicholas. *See North Colorado Medical Center Medical Staff Bylaws,* § 8.3.g, at 22–23 (1989). The Credentials Subcommittee is a committee of NCMC whose express role includes the duty to "[i]nvestigate, review, and report on matters, including the clinical and ethical conduct of any member of the Medical staff or any Allied Health Professional as may be assigned or referred to it in accordance with policies and procedures established by the Board [of Directors]." *Bylaws of North Colorado Medical Center, Inc.* 12 (1990). The Fair Hearing Panel was assembled by the Credentials Subcommittee for the express purpose of determining the scope of Nicholas's privileges. *See North Colorado Medical Center Medical Staff Corrective Action/Fair Hearing Plan* 6–13 (1988).

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

§ 11112(a). Nicholas need only show by a preponderance of the evidence that any one of these four standards was not met. *Pfenninger*, 116 F.Supp.2d at 1199; *see also Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992).

### 3. Elements of Immunity Under Section 11112(a)

We therefore examine whether Nicholas met his evidentiary burden of demonstrating that at least one of the immunity standards in section 11112(a) was not satisfied. We discuss each element in turn, and conclude that Nicholas did not meet his burden of proof.

■■■ First, NCMC's decision to suspend Nicholas's privileges had to be made "in the reasonable belief that the action was in the furtherance of quality health care." § 11112(a)(1). This element is satisfied "if the [peer] reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." H.R.Rep. No. 99–903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393. The record in this case reveals that the Board of Directors' decision was spurred by concerns over Nicholas's deficiencies in medical record-keeping and its potential harmful effect on his patients and the medical staff. The Board's decision was based on a report from its House Committee, which adopted the factual findings made by the Fair Hearing Panel. Among the Panel's conclusions were:

11. That Nicholas lacks insight into the purpose and process of creating a valid and useful medical record. He operates under the false impression that detailed dictation in procedure notes substitutes for current and complete entries in the progress notes. Nicholas's paucity of initial documentation in the progress notes and his constant need to recreate the record in light of new findings leads the Panel to the conclusion that he has a definite inability to form a rational treatment plan based on a logical progression of thought. His entries in the progress notes are inadequate to communicate his reasoning and treatment plan without additional information to nurses and other professionals. *This continuing deficiency* is, in our opinion, at the root of Nicholas's problems as it *causes others to perceive (a) a lack of judgment, (b) a lack of planning or coherent treatment plan, (c) the use of unnecessary or unindicated treatment, and (d) unethical behavior.*

. . . .

14. That the relationship of Nicholas to the staff of the Cardiac Catheterization Laboratory was strained at best and can be characterized by an *almost complete lack of communication.* This situation was caused, in part, by the practice of Nicholas to think out loud in the Laboratory. This practice *confused the staff and led to the staff's conclusion that Nicholas lacked any previously designed treatment plan whatsoever and resulted ultimately in a lack of confidence and respect.*

(Emphasis added.)

It is evident from the record that, as an objective matter, the Board of Directors could have reasonably believed that Nicholas's poor documentation and communication skills caused dissention and confusion among the laboratory staff sufficient to adversely affect patient care. Nicholas failed to present evidence that the Board's action was not supported by this reasonable belief.

Nicholas's assertion that NCMC's review was spurred by anti-competitive leanings of a competing physician does not change this calculus. Even if this allegation has merit, as the CAC found, *see Nicholas II,* 914 P.2d at 905, it does not change the numerous objective deficiencies in Nicholas's practice

that would need to be addressed in the interest of promoting quality health care.

■■■ Second, the professional review action must be taken "after a reasonable effort to obtain the facts of the matter." § 11112(a)(2). "The relevant inquiry is whether the totality of the process leading to the review action evinces a reasonable effort" to obtain the facts. *Pfenninger*, 116 F.Supp.2d at 1202 (citing *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3d Cir. 1996)). The NCMC Board of Directors suspended Nicholas's invasive cardiology privileges only after a lengthy investigation by a number of committees and independent parties, including: the initial complaints of variances with Nicholas's practice; a QA Committee investigation; Dr. Jang's independent report; the Credentials Subcommittee's review of the report and interview of Nicholas; the evidence presented before the Fair Hearing Panel; and the House Committee's review of the Panel's conclusions. Nicholas has introduced no evidence to suggest that NCMC did not make reasonable efforts to obtain the facts prior to the decision of the Board of Directors.

■■■ Third, there must be "adequate notice and hearing procedures" afforded to the physician who is the subject of the action. § 11112(a)(3).[6] The record in this case indicates that NCMC substantially complied with each of the notice and hearing requirements. On November 5, 1991, NCMC sent Nicholas notice that the Credentials Subcommittee had taken action against him and that he had a right to request a hearing within 30 days. The Credentials Subcommittee also sent Nicholas a copy of the Corrective Action Report, which set forth the Fair Hearing procedure and Nicholas's rights at the hearing. At the hearing, Nicholas was represented by counsel and afforded the opportunity to confront and cross-examine witnesses. The Fair Hearing Panel considered testimony from more than 15 individuals, as well as over 120 separate exhibits. The hearing was transcribed, and the Panel later issued a report explaining its findings and issuing its recommendation. The NCMC Board of Directors sent written notice of its decision to Nicholas. There is no evidence in the record to suggest that Nicholas was not afforded adequate notice or was denied a fair hearing.

■■■ The final immunity requirement under the HCQIA is that the professional review action be taken "in the reasonable belief that the action was warranted by the facts known." § 11112(a)(4). The question is whether "the record reveals that the [NCMC Board of Directors] had a factual basis for its action." *Bryan*, 33 F.3d at 1337. We hold that it does. Nicholas does not dispute the factual findings underlying the recommendations of the Fair Hearing Panel. Rather, he argues in his brief that the findings were set aside and were never transmitted to the Board of Directors. This assertion is not supported by the record. Indeed, in its memorandum to the Board of Directors, the House Committee cited many of the Panel's findings of fact verbatim before making its own recommendations.

The intent of the HCQIA's grant of immunity "was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Id.; Mahmoodian v. United Hosp. Ctr., Inc.*, 185 W.Va. 59, 404 S.E.2d 750, 756 (1991). Where the requirements of section 11112(a) are fulfilled, we need not extend our inquiry further. We hold that Nicholas has failed to demonstrate that section 11112(a)'s standards were not satisfied, and accordingly we determine that NCMC and the participants in the peer review process are immune from damages under the HCQIA.

### C. Immunity from State Claims under the CPRA

#### 1. Scope and Purpose of the CPRA

Shortly after Congress passed the HCQIA, the Colorado General Assembly enacted the CPRA. Act approved June 7, 1989, ch. 113, sec. 1, 1989 Colo. Sess. Laws 678–690. Like the HCQIA, the CPRA is designed to protect medical patients "from unprofessional con-

**6.** The HCQIA sets forth detailed conditions for adequate notice and hearing in section 11112(b).

duct by persons licensed to practice medicine." § 12–36.5–101(1). The CPRA establishes professional review committees "to study and review in good faith the professional conduct of physicians, including the quality and appropriateness of patient care." § 12–36.5–103(2).

The CPRA contains two parts. The first, and more comprehensive, part establishes professional review committees and sets forth guidelines for their conduct. *See* §§ 12–36.5–101 to –106. In addition, it provides that parties who conduct professional review within the statutory requirements and guidelines are immune from suit in subsequent actions brought by the physician being reviewed. § 12–36.5–105. The criteria for immunity under the CPRA depend on the status of the party seeking immunity. *See id.*

The second part of the CPRA is "intended to be responsive to the specific requirements." of the HCQIA.[7] § 12–36.5–201. As a general matter, a professional review body,[8] its members and staff, parties in a contractual relationship with it, or other participants in the professional review action "shall not be liable for damages in any civil action with respect to their participation in, assistance to, or reporting of information to a professional review body which meets the standards of and is in conformity with the provisions of the federal 'Health Care Quality Improvement Act of 1986.'" § 12–36.5–203(1).

The CPRA therefore sets out overlapping provisions that may provide a party with one or more sources of immunity stemming from participation in a professional peer review process. We now turn to whether the petitioners have satisfied these requirements.

## 2. Immunity from Suit Under the CPRA

### a. Board of Directors

▪ The CPRA establishes specific requirements for immunity for a medical facility, its governing board, and members of that board:

> The governing board, the individual members of such board, and the entity which has established a peer review committee pursuant to section 12–36.5–104 shall be immune from suit for any damages in a civil or criminal action, including antitrust actions, brought by a physician who is the subject of any action taken by such board or members if such board or members, acting as individuals, act in good faith. Good faith shall include reliance upon the recommendations of the review committee, but good faith shall not be presumed if the board or a member has knowledge concerning the review in question which would cause such reliance to be unwarranted. Good faith shall also require that the board otherwise acted in good faith, including the consideration of any facts not previously available to and considered by the peer review committee, and that the board acted in reasonable belief that the action taken was warranted by the facts.

§ 12–36.5–105(2). The plain language of the statute indicates that the sole requirement for immunity for the governing board and its members is good faith. For the purpose of section 12–36.5–105(2), "good faith" presupposes: (1) reasonable reliance upon the review committee's recommendations, unless there is knowledge that would render reliance unwarranted; (2) consideration of facts previously unknown to the review committee; (3) reasonable belief that the action taken was warranted by the facts; and (4) otherwise acting in good faith.[9]

---

7. The CPRA, however, does not share the HCQIA's presumption that professional review activities are undertaken for the purpose of assuring quality care and patient safety. *Nicholas II,* 914 P.2d at 906.

8. The term "professional review body" in the CPRA is different from the term "professional review committee." The definition of "professional review body" mirrors the definition in the HCQIA, *see* 42 U.S.C. § 11151(11), and applies only to the part of the CPRA discussing conform-

ance with the HCQIA. *See* § 12–36.5–203(3)(b). We discuss the definition of "professional review committees" in Part II.C.2.b.

9. During the 1993 hearing on anti-competitive conduct, the CAC concluded that Nicholas's peer review process was not conducted in good faith as a quality assurance measure. *See Nicholas I,* 902 P.2d at 466. We do not view this conclusion or the cases affirming it as binding collateral estoppel. The CAC's role in professional review actions is "limited to the sole issue of whether

Nicholas asserts that the Board of Directors did not act in good faith, because the Board did not reasonably rely on the recommendations of the "review committee" in this case, the Fair Hearing Panel. Rather, Nicholas claims that the Board of Directors ignored the Panel's findings, and ultimately acted on the House Committee's recommendations.

We agree that the highest-ranking NCMC organization to qualify as a "peer review committee" under the CPRA was the Fair Hearing Panel, and that as a matter of good faith, the Board was required to rely on the Panel's findings and recommendations.[10] However, "reliance" does not imply blind adherence to the Panel's recommendations. Indeed, the CPRA explicitly provides that as a matter of good faith, the Board should look to any facts not previously considered by the peer review committee, and should act in the reasonable belief that its ultimate action was warranted by the facts. § 12–36.5–105(2). Good faith is not to be presumed if the Board or its individual members willfully ignore additional information pertinent to the review. *See id.*

The record indicates that in formulating its decision, the House Committee of the Board of Directors considered both the Fair Hearing Panel report and the Credentials Subcommittee report. While the House Committee reached different recommendations regarding Nicholas's privileges than did the Fair Hearing Panel, the House Committee adopted the Fair Hearing Panel's findings of fact in making its recommendations. There is no evidence that the Board of Directors did not adopt the same findings of fact in making its final decision.

The Board's only deviation from the Fair Hearing Panel's report was its decision to temporarily suspend some of Nicholas's privileges rather than retain those privileges and keep Nicholas under supervision. This decision was within the Board's discretion and duty to act in the reasonable belief that the action taken was warranted by the facts. § 12–36.5–105(2). We therefore conclude that the Board of Directors and its members are entitled to immunity from suit under section 12–36.5–105(2).

### b. Other Participants in the Peer Review Process

The CPRA also provides immunity to participants in the professional review process who are not affiliated with the governing board of the medical facility. Section 12–36.5–105(1) states:

A member of a professional review committee, a witness before a professional review committee, or any person who files a complaint or otherwise participates in the professional review process shall be immune from suit in any civil or criminal action, including antitrust actions, brought by a physician who is the subject of the review by such professional review committee, if such member made a reasonable effort to obtain the facts of the matter as to which he acted, acted in the reasonable belief that the action taken by him was warranted by the facts, and otherwise acted in good faith within the scope of such professional review committee process and if such witness or participant acted in good faith within the scope of such professional review committee process.

The plain language of section 12–36.5–105(1) addresses immunity for two different types of parties: members of professional review committees, and participants in the peer review process who are not professional review committee members. Members of

---

[the] final board action resulted from unreasonable anticompetitive conduct." § 12–36.5–106(7). The first opportunity for the parties to conduct a full and fair hearing on the immunity issue did not occur until the trial court's hearing in January 1998.

10. The CPRA does not define "peer review committee." However, it does provide that "Any peer review committee established or created by a combination or pooling of any of the organiza-

tions authorized by" the CPRA to establish professional review committees is itself a professional review committee. § 12–36.5–104(4)(h). Because peer review committees are thus subsets of professional review committees, we conclude that peer review committees are professional review committees that are primarily composed of physicians. Neither the Board of Directors nor its House Committee meet this definition.

professional review committees are subject to a three-pronged immunity test similar to that for "good faith" for governing boards in section 12–36.5–105(2). Members of professional review committees are immune from suit by a physician who is the subject of the review if: (1) the member made a reasonable effort to obtain the facts of the matter; (2) the member acted in the reasonable belief that the action taken was warranted by the facts; and (3) the member otherwise acted in good faith within the scope of the review process. § 12–36.5–105(1).

■■■ Individual witnesses and participants in the professional review process who are not members of the professional review committee or affiliated with the medical facility's governing board are entitled to immunity from suit as long as they have acted in good faith within the scope of the professional review process. *Id.*

Having laid out the immunity provisions for individual parties, we apply the appropriate provisions to petitioners Alyce Kantner and Karl Gills.[11] We conclude that each of these petitioners is entitled to immunity under the CPRA.

### (1) Alyce Kantner

■■■ Alyce Kantner was the director of the medical staff at NCMC from the fall of 1989 to the end of 1991. Kantner was a member of the hospital's administrative staff, and also served as support staff for the QA Committee and the Credentials Subcommittee. However, she was not a member of either the QA Committee or the Credentials Subcommittee. The record indicates that in her support staff role, Kantner was responsible for providing various documents and maintaining paperwork. Kantner also participated in the drafting of the Credentials Subcommittee's Corrective Action Report. Her employment with NCMC ended before the Fair Hearing Panel began its activities.

Because Kantner was not a member of the Board of Directors or any committee relevant to this case, we evaluate her immunity solely as a participant in the peer review process. Kantner is accordingly entitled to immunity from suit under section 12–36.5–105(1) if she acted in good faith within the scope of the professional review process.

Nicholas alleges that Kantner did not act in good faith for the purposes of section 12–36.5–105(1) because she provided biased information to independent reviewers, distributed altered copies of an echocardiogram (EKG) to the Credentials Subcommittee, and subjectively desired that Nicholas lose his privileges. The trial court, however, concluded that Kantner had acted reasonably and in good faith. The evidence in the record supports the trial court's conclusion. The information Kantner provided to the outside reviewer was appropriate for such a review; there is no indication that the information she provided was false, and it was the province of the outside reviewer to determine importance and relevancy of the information provided. Nor does the evidence show that Kantner acted in bad faith in distributing copies of the "altered" EKG.[12] Furthermore, as the trial court noted, even if Kantner did subjectively believe that Nicholas should not be practicing at NCMC, she was privy to information that would justify that belief. The evidence in the record supports the conclusion that Kantner acted in good faith, and she is therefore entitled to immunity from suit under section 12–36.5–105(1).

### (2) Karl Gills

At the time of Nicholas's peer review, Karl Gills was NCMC's senior vice-president. In this capacity, Gills was a member of the Credentials Subcommittee and the House Committee. However, Gills was not a voting member of the House Committee, and his

11. Nicholas initially named two additional individual defendants, Richard Stenner and Pat Kern. Nicholas dropped all claims against Stenner and Kern during the immunity hearing.

12. According to testimony at the immunity hearing, Nicholas gave Kantner a black-and-white copy of an EKG with blue writing on it for review by the Credentials Subcommittee. Kantner's staff then made copies of the document and distributed them. The Subcommittee apparently inferred from the copies that Nicholas had impermissibly altered the original EKG. There is no evidence in the record that Kantner acted to mislead the Subcommittee.

role on the House Committee was primarily to provide information on hospital activities.

The appropriate immunity test for Gills under section 12–36.5–105 turns on whether the Credentials Subcommittee and the House Committee were "professional review committees" within the meaning of the CPRA. If they were, Gills must satisfy the three-pronged test for members of professional review committees; if they were not, Gills must be evaluated under the "good faith" standard as a participant in the professional review process.

The CPRA defines "professional review committee" as "any committee authorized under the provisions of this article to review and evaluate the professional conduct of and the quality and appropriateness of patient care provided by any physician licensed" in Colorado. § 12–36.5–102(3). Authorized professional review committees must satisfy the following statutory conditions: (1) they must be composed of a majority of physicians, *see* § 12–36.5–104(2); (2) they must be established by the hospital's medical staff, its governing board, or a combination thereof, *see* § 12–36.5–104(4); and (3) they must operate pursuant to written bylaws, approved by the hospital's governing board, that are in compliance with the CPRA, *see id.*

■ Given these criteria, we conclude that only the Credentials Subcommittee qualifies as a "professional review committee" within the meaning of the CPRA. The Credentials Subcommittee is composed of a majority of physicians, was established by NCMC's governing board, and operates pursuant to substantially conforming hospital bylaws. The House Committee, which is not composed primarily of physicians, is not a "professional review committee" under the CPRA. Therefore, we must evaluate Gills's immunity for participation in the Credentials Subcommittee and the House Committee separately.

■ Gills is entitled to immunity for his involvement in the House Committee proceedings if he acted in good faith. § 12–36.5–105(1). Nicholas argues that Gills did not act in good faith primarily because Gills served on both the Credentials Subcommittee and the House Committee, and did not recuse himself from the House Committee even when that committee was considering the report and recommendations of the Credentials Subcommittee in the Nicholas matter. Citing *deKoevend v. Board of Education,* 688 P.2d 219, 228 (Colo.1984), the court of appeals concluded that Gills improperly served as a member of both committees during Nicholas's professional review process. *See Nicholas III,* 12 P.3d at 290. We disagree.

■ The facts of *deKoevend* are distinguishable from those before us here. In that case, a school board terminated the employment of a tenured teacher after a closed door session that included the principal complainants against the teacher, but not the teacher himself. We noted that the presence in the closed door session of parties with a prosecutorial role "was such as to substantially undermine the appearance of impartiality." *deKoevend,* 688 P.2d at 228. Here, by contrast, Gills's role in the professional review process is best characterized as investigative, not prosecutorial. Gills did not bring any charges against Nicholas; rather, he investigated the charges brought to the Credentials Subcommittee's attention. As the United States Supreme Court has noted, there is no logical or legal inconsistency in a certain mixing of investigative and adjudicative roles in administrative proceedings. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). A party seeking to show bias resulting from these dual roles "must overcome a presumption of honesty and integrity in those serving as adjudicators" and must show that "conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.*

Nicholas has made no such showing here. The evidence in the record demonstrates that Gills's dual role did not improperly influence the House Committee's recommendations or the Board of Directors' final decision. Gills did not participate in the House Committee deliberations, but served merely as a link between that committee and the Credentials Subcommittee. His involvement in both or-

ganizations was not improper. Therefore, we conclude that Gills is immune from suit for his involvement in the House Committee activities.

■ Because the Credentials Subcommittee is a "professional review committee" within the meaning of the CPRA, Gills is immune from suit as a member of the Credentials Subcommittee only if he made a reasonable effort to obtain the facts of the Nicholas matter, reasonably relied on those facts in making recommendations, and otherwise acted in good faith. Nicholas only contends that Gills failed the "good faith" prong of this test, maintaining that Gills, like Kantner, supplied biasing documents to outside reviewers. Our review of the record shows that Gills did not knowingly provide any biased information. Nor is there any other indication of lack of good faith, or personal or pecuniary interest in removing Nicholas's privileges. We therefore conclude that Gills is immune from suit as a member of the Credentials Subcommittee under section 12–36.5–105(1).

### 3. Immunity from Damages Under the CPRA

■ As a separate source of immunity, the CPRA grants professional review bodies, their members, parties in contract with them, and other participants in the professional review process immunity from liability for damages when they act in accordance with the HCQIA. § 12–36.5–203. NCMC satisfied the terms of the federal statute, *see* Part II.B., and falls squarely within the definition of "professional review body" in the CPRA. *See* § 12–36.5–203(3)(b). All petitioners are therefore immune from liability for damages under this section.[13] *See id.*

■ Finally, the CPRA provides one additional source of immunity to individuals. No person who provides information to a professional review body regarding the competence or professional conduct of a physician shall be held liable in damages in any civil action for having provided such informa-

tion "unless such information is false and the person providing it knew that such information was false." § 12–36.5–203(2). There is no evidence that either Kantner or Gills knowingly provided false information to the QA Committee, Credentials Subcommittee, or the House Committee. Kantner and Gills are therefore also immune from liability for damages under section 12–36.5–203.

Because NCMC, its Board of Directors, and the individually named petitioners are each immune from suit under the CPRA and immune from liability for damages under the CPRA and HCQIA, Nicholas may not advance his remaining state law claims arising from the professional peer review process.

### III.

Both the United States Congress and the Colorado General Assembly have demonstrated a clear intent to encourage professional peer review in the medical field, and to immunize participants in the peer review process from subsequent liability and/or suit when the process satisfies appropriate standards. We hold that the petitioners have met these standards, and therefore enjoy immunity from Nicholas's state law claims. In addition, we hold that Nicholas may not advance his claim for violations of federal civil rights under 42 U.S.C. § 1983, because NCMC's activities do not qualify as "state action" necessary to trigger the statute. Accordingly, we reverse the judgment of the court of appeals and remand the case to that court with directions to return it to the trial court to reinstate the orders granting summary judgment for NCMC.

---

13. Because the petitioners are immune from suit under the first part of the CPRA, they also enjoy the lesser immunity from liability for damages. We nevertheless address this issue because it is so closely tied to our analysis under the HCQIA and the first part of the CPRA. *See* Parts II.B. and II.C.2. of this opinion.